745 P.2d 181

**Jerome S. BLUMENTHAL, Plaintiff–Appellant,**

v.

**John TEETS and Jane Doe Teets, husband and wife, et al., Defendants–Appellees,**

and

**The Greyhound Corporation and Greyhound Leasing and Financial Corporation, Nominal Defendants–Appellees.**

**No. 1 CA–CIV 8894.**

Court of Appeals of Arizona, Division 1, Department C.

Sept. 24, 1987.

Hecker, Phillips & Hooker by Robert J. Hooker, Tucson, and Abbey & Ellis by Ralph L. Ellis, Mark C. Gardy, New York City, for plaintiff-appellant.

Lewis and Roca by Douglas L. Irish, Dale A. Danneman, Phoenix, for defendants-appellees Teets, Nageotte, nominal defendants-appellees Greyhound.

Levy, Sherwood, Klein & Dudley, P.A. by Andrew R. Sherwood, Wayne C. Arnold, Phoenix, for defendants-appellees Bertrand.

## OPINION

SHELLEY, Presiding Judge.

Plaintiff Jerome S. Blumenthal filed a derivative complaint against the corporate defendants, some of their directors, and some of their officers and employees. No pre-suit demand was made. He attempted to allege gross negligence in the supervision and approval of two loans made by Greyhound Leasing and Financial Corporation to a person named Sheldon Player. The trial court dismissed the suit, holding that the plaintiff failed to comply with the requirements of Rule 23.1, Arizona Rules of Civil Procedure, which provides that a shareholder may not file a derivative complaint unless he has made a pre-suit demand upon the directors to file a suit or in the alternative, that a shareholder must allege in his complaint sufficient facts to show that a demand would have been futile. We affirm the trial court.

The following alleged facts are based on plaintiff Jerome S. Blumenthal's complaint, his statements regarding the nature of the case in the opening brief, and the exhibits appended to plaintiff's opening brief.

The pleadings and briefs in this case usually refer to both Greyhound Leasing and Financial Corporation, and Greyhound Corporation as "Greyhound." Due to the confusion that this single reference has caused, we will refer to Greyhound Leasing and Financial Corporation singly as "GLFC." We will refer to Greyhound Corporation by its full name. When we refer to GLFC and Greyhound Corporation, we will use the term "Greyhound."

GLFC is a wholly-owned subsidiary of Greyhound Corporation. GLFC primarily engages in the business of providing asset-based financing of transportation, industrial and commercial equipment through direct financing leases, conditional sale contracts and secured loans. It also makes loans secured by mortgages of real estate or by security interests related to real estate.

Over a period of five years, GLFC loaned Sheldon Player (Player) a total of $7,700,-000, purportedly for the purchasing and financing of machine tools. There is no assertion that these loans were not duly paid. In August, 1984, Player requested a loan of $40 million from GLFC. In support of his request for a loan commitment, Player supplied a letter from the Hycalog Division of N.L. Industries, Inc., stating its desire to purchase $40 million of equipment from Player over an 18–month period. About four months later, GLFC gave Player an additional loan of $50 million for the stated purpose of financing the acquisition of oil field equipment, with the equipment to secure the loan.

Under the loan agreements, the lenders would purchase the equipment from Player or entities controlled by him and then lease back the equipment to Player or entities controlled by him, then in turn Player would sublet the equipment to the ultimate users. Player represented that certain pieces of equipment had already been subleased and produced documentation to that effect. The documentation included letters from the ultimate users of the equipment requesting the equipment, purchase orders, and legal opinion letters verifying the existence of the equipment. The loan commitment requests were approved by the board of directors and officers of Greyhound. Between August, 1984 and December, 1984, $66 million was disbursed to Player from the $90 million total loan commitment. No independent verification was made of the transactions by Greyhound. All of the documents supplied by Player subsequently proved to be forgeries, and the equipment mentioned in the loan agree-

ments was nonexistent. Player used the money to purchase real estate, stocks and automobiles.

In February, 1985, Greyhound requested an inspection of the collateral but Player impeded those attempts. In July, 1985, an attorney for Player met with Greyhound to discuss the loans. At this meeting, Greyhound learned that the collateral backing the loans was nonexistent and further learned of the diversion of the money loaned.

In approximately July, 1985, after learning of the nonexistent collateral and diversion, Greyhound entered into a subsequent agreement with Player. Under the subsequent agreement and its amendment, Player, among other things, agreed to purchase Greyhound's interest in the bogus equipment leases. The consideration given by Player was a promissory note in the principal sum of $79,736,153, which was to be paid by December 15, 1985.

Player also executed and delivered to Greyhound a deed of trust and assignment of rents on the real property purchased by him with all or part of the money loaned to him from Greyhound. Player represented:

(a) That the property securing the note was worth $125 million;

(b) That each and every representation in the agreement was true and correct;

(c) That he had actual authority to enter into the agreement; and

(d) That he had good and marketable title to an indefeasible fee interest in the property subject to the deed of trust and assignment of rents.

Each of the above representations proved false because, among other reasons:

(a) The value of the real properties securing the note had only an estimated worth of between $25 and $40 million, and in any event, the said real properties were worth substantially less than monies loaned;

(b) Certain third parties had *claims* concerning Player's lack of authority to act on behalf of certain persons who assumed obligations to Greyhound in the agreement entered into between Greyhound and Player; and

(c) Still another third party *claimed* fee ownership of the real estate.

In approximately August, 1985, Greyhound publicly disclosed the loan problem with Player and GLFC sued Player along with approximately 60 other defendants. The only action Greyhound took against its employees, officers and directors was the firing of defendant Mayne, a former GLFC sales representative; defendant Leyton, a former GLFC general counsel; defendant Foley, a former GLFC vice president; and defendant Hymson, a former GLFC chief legal counsel and vice president for risk management.

On January 20, 1986, plaintiff Blumenthal brought this suit on behalf of Greyhound Corporation, wherein he alleged that he was and is the owner of common shares of Greyhound Corporation stock. The suit was filed against the individual directors of Greyhound Corporation, together with Scott Mayne, Jeffrey Leyton, James T. Foley, and Irving Hymson as officers of Greyhound Corporation and/or GLFC. Plaintiff also sued Robert W. Bertrand in his capacity as a director, president and chief executive officer of GLFC. He sued Greyhound Corporation and GLFC as nominal defendants. Bertrand was the only director of GLFC who was made a party to this case. The lawsuit was filed without making a pre-suit demand upon the board of directors of Greyhound to institute the action. In the complaint, plaintiff alleged that the attempt was unnecessary and would have been futile because:

(a) The defendants approved and/or recommended the loans ... and thus caused Greyhound to incur the losses ... alleged;

(b) *The defendant directors* are not capable of exercising an independent and unbiased business judgment whether it is in the best interests of Greyhound to pursue this derivative claim which would have to be prosecuted against themselves; and

(c) Although the transactions complained of commenced over one year ago, and although Greyhound has instituted suit

in the United States District Court for the District of Arizona to recover the losses it has sustained based thereon, it has carefully omitted to include the individuals named herein among the approximately 60 defendants in its suit. (Emphasis added.)

All of the defendants moved to dismiss the complaint for failure to comply with Rule 23.1, Arizona Rules of Civil Procedure, which provides in relevant part:

In a derivative action brought by one or more shareholders or members to enforce a right of a corporation ... the ... complaint shall ... allege *with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors ... and the reasons for his failure to* obtain the action *or for not making the effort.* (Emphasis added.)

Under Rule 23.1, if a pre-suit demand is not made upon a corporation's board of directors to file suit in order to enforce the rights of the corporation, then the shareholder must allege with particularity in a suit to enforce such rights why a demand would be futile. The trial court granted the motion to dismiss, holding that appellant failed to make the requisite demand as required by Rule 23.1, Arizona Rules of Civil Procedure, and further failed to allege with particularity sufficient facts to show why such a demand would have been futile.

The trial court also awarded attorney fees to all of the defendants, finding that plaintiff's action was brought without reasonable cause, and that pursuant to A.R.S. § 10–049(B), an award of reasonable attorney fees and expenses was warranted. However, the court refused to impose sanctions pursuant to Rule 11(a), Arizona Rules of Civil Procedure.

Plaintiff appealed from the trial court's order, setting forth three issues:

(1) Did the trial court err in finding that the complaint failed to allege with particularity sufficient facts to excuse a pre-suit demand?

(2) Did the trial court err in awarding attorney fees to appellees pursuant to A.R.S. § 10–049(B)?

(3) Did the trial court err by not granting appellant leave to amend his complaint?

## REQUIREMENT OF PRE–SUIT DEMAND

There are no Arizona cases which discuss the circumstances under which a demand on the board of directors to bring a lawsuit may be considered futile. The parties agree that GLFC is a Delaware corporation and that this case should be decided under Delaware law. The case of *Aronson v. Lewis,* 473 A.2d 805 (Del.1984) is the seminal and controlling case in Delaware on the issue of demand futility. Additionally, Delaware Chancery Rule 23.1 is similar to our Rule 23.1. In *Aronson* we read:

A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation. 8 Del.C. § 141(a). Section 141(a) states in pertinent part:

"The *business and affairs of a corporation* organized under this chapter *shall be managed by or under the direction* of a board of directors except as may be otherwise provided in this chapter or in its certificate of incorporation."

*Id.,* 473 A.2d at 811.

Arizona Revised Statutes § 10–035 states: "The business and affairs of a corporation *shall be managed by a board of directors* except as may be otherwise reserved to the shareholders in the Articles of Incorporation." (Emphasis added.) In Arizona, like Delaware, the directors rather than the shareholders manage the affairs of the corporation.

A derivative action infringes upon the managerial freedom of directors. The purpose of Rule 23.1 is to insure that a stockholder exercises his intra-corporate remedies before filing suit. The *Aronson* court stated:

In our view the entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability. The business judgment rule is an ac-

knowledgment of the managerial prerogatives of Delaware directors under Section 141(a). It is a *presumption* that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. *Absent an abuse of discretion,* that judgment will be respected by the courts. The burden is on the party challenging the decision to establish facts rebutting the presumption.

\*    \*    \*    \*    \*    \*

First, its protections can only be claimed by disinterested directors whose conduct otherwise meets the tests of business judgment. From the standpoint of interest, this means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally.

*Id.,* 473 A.2d at 812. (Emphasis added; citations omitted.)

In the instant case, we are not concerned with the first principle because plaintiff states it is "not positing director interest."

We now turn to the second principle as stated by *Aronson:*

Second, to invoke the rule's protection directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them. Having become so informed, they must then act with requisite care in the discharge of their duties. While the Delaware cases use a variety of terms to describe the applicable standard of care, *our analysis satisfies us that under the business judgment rule director liability is predicated upon concepts of gross negligence.* (Emphasis added.)

*Id.* Plaintiff asserts that the complaint alleges facts constituting gross negligence on the part of the directors with sufficient particularity to show demand futility. As stated in *Aronson:*

Our view is that in determining demand futility the Court of Chancery in the proper exercise of its discretion must decide whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent *and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.* Hence, the Court of Chancery must make two inquiries, one into the independence and disinterestedness of the directors *and the other into the substantive nature of the challenged transaction and the board's approval thereof. As to the latter inquiry the court does not assume that the transaction is a wrong to the corporation requiring corrective steps by the board. Rather, the alleged wrong is substantively reviewed against the factual background alleged in the complaint.* (Emphasis added.)

*Id.,* 473 A.2d at 814.

■ We must decide if the complaint alleges gross negligence with sufficient particularity. Conclusions do not suffice. This issue was discussed in *Aronson:*

In our view demand can only be excused where facts are alleged with particularity which create a reasonable doubt that the director's action was entitled to the protection of the business judgment rule.

*Id.,* 473 A.2d at 808. Both the Committee on Corporate Laws of the American Bar Association and the Business Roundtable recognize that the board members themselves are not expected to operate the business:

Even under statutes [like Arizona's] providing that the business and affairs shall be "managed" by the board of directors, *it is recognized that actual operation is a function of management. The responsibility of the board is limited to overseeing such operation.* (Emphasis added.)

*Corporate Director's Guidebook,* 33 Bus.Law 1591, 1603 (1978).

It is plainly impossible for a board composed partly of "outsiders", that is partly of persons who are not full-time employ-

ees, to conduct ... day-to-day [corporate] affairs.

*The Role and Composition of the Board of Directors of the Large Publicly Owned Corporation,* 33 Bus.Law 2083, 2094 (1978).

The reason for limiting responsibility of the board of directors to overseeing the corporation's operation is applicable to the directors of Greyhound Corporation. The complaint alleges that Greyhound Corporation is a multi-million dollar holding company which through subsidiaries engages in the businesses of transportation, bus manufacturing, services and food service, consumer products and financial services. GLFC is involved only in financial services. The complaint does not inform us how many subsidiaries there are in addition to GLFC.

Greyhound Corporation's board of directors could not be expected to have detailed information regarding every transaction to which GLFC and its other subsidiaries are parties. The primary responsibility for the operation of GLFC would belong to its management team with the duty of overseeing such operations belonging to GLFC's board of directors. Greyhound Corporation's board of directors' responsibility would be secondary.

The record contains no allegations that the $7.7 million previously loaned to Player over a period of five years was not repaid. The inference from the pleadings is that Player's credit record was good at the times the loans in question were made.

The complaint alleges that Scott Mayne, an officer of Greyhound, approved the loan applications without proper investigation and recommended the same to the Greyhound board of directors. The complaint also identifies Mayne as a sales representative of GLFC who was subsequently fired by Greyhound. The complaint further alleges that Player represented that certain pieces of equipment had already been subleased and produced documentation to that effect. The documentation included letters from the end users of the equipment along with an equipment purchase order and legal opinion letters verifying the existence of the equipment.

The two loans facially appeared to be valid business transactions when presented to Greyhound Corporation's board of directors with the accompanying loan documents.

There is no allegation that Greyhound Corporation's board of directors knew that the GLFC directors, and/or officers, and/or employees had failed to authenticate the loan transactions or to conduct a physical inspection of the equipment. The members of GLFC's board of directors are not made parties to this suit except for Robert W. Bertrand, who is alleged to be a director, president and chief executive officer of GLFC, yet GLFC is in the lending business, and is the entity which made the loans.

The subsequent agreement entered into with Player in July 1985 which involved a promissory note, a deed of trust and an assignment of rents, does not indicate gross negligence on the part of the defendant directors. From the complaint it could reasonably be inferred that as a result of the subsequent agreement, the $66 million loan was reduced to $55 million, and through the subsequent agreement there exists a possibility of further recovery, in spite of the claims of others, with respect to the deed of trust. This subsequent agreement placed Greyhound in a better position than it was in when it was discovered that the security given for the two loans was non-existent.

Nowhere in the complaint is there any allegation that Greyhound Corporation's board of directors has in fact declined to sue any of its own directors or GLFC's board of directors.

Plaintiff refers to the lawsuit filed by GLFC against Player and about 60 other defendants attempting to recover the balance of the money owed to it on the two loans. Plaintiff contends that since GLFC did not name any of Greyhound's directors, officers or employees as defendants in said lawsuit, this proves that Greyhound did not intend to seek redress from said directors, officers or employees.

The lawsuit filed by GLFC was primarily based upon allegations of fraud. A lawsuit

against the board of directors, officers or employees of the corporation would have to be based on the theory of gross negligence inasmuch as there is no assertion of self-dealing. It would be poor judgment to make such a joinder. The failure of GLFC to join the board of directors of Greyhound is no indication that Greyhound Corporation's board of directors would not file a subsequent lawsuit against Greyhound's directors, officers or employees.

The allegation that the defendant directors are not capable of exercising an independent and unbiased business judgment as to whether it is in the best interests of Greyhound to pursue this derivative claim, inasmuch as it would have to be prosecuted against themselves, does not suffice to show demand futility. As stated in *Aronson:*

> Plaintiff's final argument is the incantation that demand is excused because the directors otherwise would have to sue themselves, thereby placing the conduct of the litigation in hostile hands and preventing its effective prosecution. This bootstrap argument has been made to and dismissed by other courts. *See, e.g., Lewis v. Graves,* 701 F.2d 245, 248–49 (2d Cir.1983); *Heit v. Baird,* 567 F.2d 1157, 1162 (1st Cir.1977); *Lewis v. Anselmi,* 564 F.Supp. 768, 772 (S.D.N.Y.1983). Its acceptance would effectively abrogate Rule 23.1 and weaken the managerial power of directors. *Unless facts are alleged with particularity to overcome the presumptions of independence and a proper exercise of business judgment, in which case the directors could not be expected to sue themselves, a bare claim of this sort raises no legally cognizable issue under Delaware corporate law.* (Emphasis added.)

*Id.,* 473 A.2d at 818.

Since director liability must be determined in this case under the business judgment rule, it must be predicated upon concepts of gross negligence. We find that the trial court did not err in finding that the complaint failed to allege gross negligence with sufficient particularity to demonstrate demand futility. The plaintiff has therefore failed to comply with Rule 23.1, which requires that such lawsuits must allege with particularity the reasons for not making pre-suit demand upon the directors.

## AWARD OF ATTORNEY FEES

The trial court granted the motion to dismiss and awarded attorney fees to the defending parties pursuant to A.R.S. § 10–049(B), finding that plaintiff's action was brought without reasonable cause. A.R.S. § 10–049(B) reads:

> In any action hereafter instituted in the right of any domestic or foreign corporation by the holder or holders of record of shares of such corporation or of voting trust beneficial interest therefor, the court having jurisdiction, *upon final judgment and a finding that the action was brought without reasonable cause, may require the plaintiff or plaintiffs to pay to the parties named as defendant the reasonable expenses, including fees of attorneys, incurred by them in the defense of such action.*

Plaintiff argues that he had reasonable cause to file his lawsuit because he relied upon an article in the *Wall Street Journal.* He further argues that both *Lewis v. Curtis,* 671 F.2d 779 (3rd Cir. 1982), and *In re Ramada Inns Securities Litigation,* 550 F.Supp. 1127 (D.Del.1982), state that Wall Street Journal articles may be relied upon to show reasonable cause for filing a complaint of this nature. In *Lewis,* the court stated that a party can rely on a Wall Street Journal article in order to show reasonable grounds required for verification of a stockholder's derivative complaint under Rule 23.1. In the *Ramada Inn* case, the court stated:

> Rule 11 [Federal Rules of Civil Procedure] provides that the signature of the attorney who signs a pleading "constitutes a certificate by him ... that to the best of his knowledge, information, and belief there is *good cause* to support it." The purpose of Rule 11 is "to place a moral obligation upon the attorney to satisfy himself that there are good grounds for the action." 5 Wright & Miller, *Federal Practice and Procedure,* § 1333 (1971). (Emphasis added.)

*Id.,* 550 F.Supp. 1127 at 1132.

The reference to "good cause" by that court is the same as the reasonable cause

requirements of A.R.S. § 10–049(B). The court held that a Wall Street Journal article could be relied on to show good cause. However, these cases do not say that one can rely on a Wall Street Journal article regardless of content. The Wall Street Journal article referred to by plaintiff primarily sets forth the possibility of negligence on the part of the officers and employees and perhaps the directors of GLFC. For the most part, any statements with regard to the Greyhound Corporation are based on conclusions rather than a detailing of facts. There is nothing in that article which constitutes reasonable cause for the filing of this complaint.

In the case of *Callanan v. Sun Lakes Homeowners Association #1, Inc.*, 134 Ariz. 332, 336, 656 P.2d 621, 625 (App. 1982), the court stated:

> We therefore hold that in exercising his discretion under A.R.S. § 10–049(B) the trial judge was entitled to consider, in determining the presence of "reasonable cause", plaintiff's failure to comply with Rule 23.1.

Plaintiff asserts that *Callanan* is inapposite because in that case, there was no attempt to allege reasons for demand futility. He claims that in this case he did properly allege demand futility or in the alternative, that he made a good faith attempt. Even though in this case plaintiff may have attempted to allege demand futility with sufficient particularity, he did not do so. Although there is a factual difference, the holding in *Callanan* still applies.

The trial court was entitled to also consider plaintiff's failure to comply with Rule 23.1 in determining whether reasonable cause existed to justify filing this complaint without making pre-suit demand. The trial judge did not abuse his discretion in the award of attorney fees.

## AMENDED COMPLAINT

Plaintiff asserts that the trial judge erred in refusing to allow him to amend his complaint. He argues that Arizona case law requires that leave to amend should be granted liberally and cites *Van Denburgh*

*v. Tungsten Reef Mines Co.*, 48 Ariz. 540, 63 P.2d 647 (1936), for that proposition.

Greyhound argues that no motion to amend was ever made. Appellees point out that the only time plaintiff mentioned the possibility of amending his complaint was in the last sentence of his response to appellee's motion to dismiss. That sentence reads: "Should the Court decide in favor of defendants ... plaintiff respectfully requests leave to replead."

Appellees assert that pursuant to *Estate of Torentson v. Valley National Bank*, 125 Ariz. 373, 609 P.2d 1073 (App.1980), the right to amend a pleading is not automatic. They also assert appellant's reference to repleading does not comply with the applicable rule of civil procedure or the applicable rule of practice. We agree.

Rule 7(b)(1), Arizona Rules of Civil Procedure, provides:

> An application to the court for an order shall be by motion which, unless made during a hearing or trial, shall be made in writing, shall state with particularity the grounds therefor, and shall set forth the relief or order sought.

Rule IV(a), Uniform Rules of Practice of the Superior Court of Arizona, provides:

> *Formal requirements.* All motions made before and after trial shall be in writing, shall indicate the precise nature of the relief requested, shall be accompanied by a memorandum indicating, as a minimum, the precise legal points, statutes and authorities relied on, citing the specific portions or pages thereof, and shall be served on the opposing parties.

The record shows that plaintiff did not file a motion to amend and did not make application to the court for leave to amend during a hearing or trial. Plaintiff's one reference to repleading in his response to the motion to dismiss is not a motion and is not pleaded with particularity as required by Rule 7. The record shows that more than three months elapsed between the time that the court rendered its decision and the time that final judgment was entered. During that time, the plaintiff did not file any motion to amend the complaint. The failure of the trial court to allow plaintiff to amend the complaint was not error.

## ATTORNEY FEES ON APPEAL

 All of the defending parties have requested attorney fees on appeal. We find that there was a lack of reasonable cause to file this action without a pre-suit demand. Defendants are awarded their attorney fees under A.R.S. § 10–049(B) and Rule 21(c), Arizona Rules of Civil Appellate Procedure. We note, however, that the appellate briefs filed by Bertrand and those filed on behalf of the other defendants are duplicative in most respects. We will take that into account in determining the amount of attorney fees that should be awarded.

The judgment of the trial court is affirmed.

CORCORAN and CONTRERAS, JJ., concur.