RESOLUTION TRUST CORPORATION, as Receiver of Sentinel Savings & Loan Association and Sentinel Federal Savings & Loan Association, Plaintiff,

v.

James A. BLASDELL, et al., Defendants.

No. CIV 93–199 PHX RCB.

United States District Court, D. Arizona.

Sept. 15, 1994.

See also, 154 F.R.D. 675.

Denis F. Shanagher, Preuss Walker & Shanagher, San Francisco, California, Sandra L. Slaton, Slaton Law Offices, Phoenix, Arizona, Jon A. Stewart, Resolution Trust Corporation, Legal Division, Washington, D.C., for Plaintiff.

Peter K. Rosen, Rosen Law Firm, Los Angeles, California, William J. Maledon, Osborn Maledon, P.A., Phoenix, Arizona, for Defendants.

### ORDER

BROOMFIELD, Chief Judge.

Defendants Frank and Juanita Campbell have filed a motion for summary judgment pursuant to Rule 56(b), Federal Rules of Civil Procedure. Defendants James A. Blasdell, Robert M. Charles, John N. Corbin, David H. Eaton, William A. Hazelett, Edwin C. Lynch, Joseph L. Refsnes, and William G. Was have joined in the Campbells' motion and have filed a supplemental memorandum and statement of facts of their own. Plaintiff Resolution Trust Corporation opposes defendants' motion, and the parties have fully briefed the relevant issues. The court heard oral argument on the motion on June 20, 1994, and now rules.

## I. *INTRODUCTION*

Sentinel Savings & Loan Association ("Sentinel") opened for business in January 1985 and was insolvent and out of business by February 1990. Its short life was marked by very rapid initial growth and subsequent wrangling with federal regulators. On February 1, 1990, the Office of Thrift Supervision appointed the Resolution Trust Corporation (the "RTC") as liquidating receiver of Sentinel.

In an effort to recoup money lost by the government in liquidating Sentinel, the RTC has brought this action against Sentinel's directors, its law firm, and certain officers. The court already has granted the law firm's motion to dismiss and judgment has been entered with respect to that defendant.

The RTC has alleged claims against the directors for negligence, gross negligence, negligence per se, and breach of fiduciary duty. According to the RTC, the bad loans that led to Sentinel's demise were brought about by the directors' failure to adequately perform their directorial duties. More specifically, the RTC alleges that the directors failed to institute proper commercial lending policies and procedures for management to follow despite being warned of the inadequacy of existing procedures on a number of occasions by federal regulators. The directors also allegedly routinely allowed loans to be funded, modified, or extended prior to board approval. The RTC asserts that board members slept at meetings, failed to ask substantive questions, and otherwise neglected their duties. The picture painted by the RTC is that the directors simply abdicated their responsibilities while Sentinel rose and then fell.

As ordered by the court, the RTC's Complaint sets forth the specific loan transactions which, the RTC asserts, resulted from the directors' alleged breach of duties. Details regarding these transactions have been pled,

as have the reasons why the transactions allegedly were improper. The losses allegedly inflicted upon Sentinel as a result of these transactions total more than $20 million.

The directors have moved for summary judgment on two primary grounds. First, the directors argue that the RTC's claims must be dismissed pursuant to the business judgment rule. Second, the RTC's claims arising from seven of the ten transactions allegedly are barred on statute of limitations grounds. The Campbell defendants have, alternatively, moved for partial summary judgment on the ground that they can only possibly be held liable for the three loan transactions that were approved while Campbell served as a board member. The director-defendants (the directors other than Campbell) also argue that they cannot be held liable for one of the loan transactions because of misrepresentations made by the borrowers.

## II. THE EVIDENCE

In its papers, the RTC levies broad criticisms at the directors, contending that they simply failed to do their job. The directors respond that the RTC's papers improperly characterize the actual evidence of record. The court, therefore, has thoroughly reviewed the evidence presented as well as each side's objections to evidence presented by the other.[1]

### A. The RTC's Evidence

The RTC has submitted three affidavits and exhibits supporting those affidavits to support its claims. The defendants likewise have submitted a number of affidavits in an attempt to establish that they performed their duties adequately enough to avoid liability.

One of the RTC's primary allegations is that the directors allowed management to engage in commercial lending without adequate policies and procedures. In support of this claim, the RTC has submitted the affidavit of John W. Behrens, who was the Supervisory Agent for the Federal Home Loan Bank Board charged with supervising Sentinel. Behrens' affidavit attaches a number of letters from him to Sentinel's directors which explain various deficiencies in Sentinel's commercial lending policies and procedures.

The first letter, dated December 11, 1985, asserts that Sentinel had grown faster than projected in Sentinel's business plan. The letter asked for information from the directors, including information about the policies and procedures adopted to handle the increased growth.

The second letter, dated May 23, 1986, stated that a recent report from the Office of Examination indicated that Sentinel had not established comprehensive policies and procedures for making loans. The letter requested that no further construction or major loans be made until the directors developed adequate written policies and procedures.

On May 30, 1986, Behrens again wrote Sentinel's directors, stating that his office had "supervisory concerns about the safety of the operations of Sentinel Savings, especially with regard to deficiencies in lending policies and procedures." The letter went on to acknowledge, however, that he had received new policies and procedures from Sentinel on May 29, 1986, and that the directors would be advised of any deficiencies.

In a letter dated August 29, 1986, Behrens' summarized a recent report issued by the FHLBB regarding Sentinel. The letter stated, among other things, that Sentinel had failed to keep its loans-to-one-borrower report current. Behrens sought the directors' assurances that appropriate controls had been implemented to prevent further violations in the future. The letter also noted that he had received a letter from the di-

---

1. The RTC and the director-defendants (other than the Campbells) have submitted an extraordinary amount of papers to the court in conjunction with this motion. Both the RTC and these defendants have objected to nearly every statement of fact and piece of evidence submitted by the other on evidentiary or other grounds.

Many, many of the objections are either unfounded or, at best, petty. In summarizing the evidence before the court and in reaching its ultimate decision, the court has not found it necessary to resolve each objection submitted by the parties.

rectors that was "generally responsive" to the concerns expressed in his May 30, 1986 letter. He stated that certain issues still needed to be addressed, specifically, he asked for clarification and/or comments regarding a number of aspects of Sentinel's new lending policies and procedures.

On December 11, 1986, Behrens summarized the most recent quarterly Report of Examination of Sentinel. He stated that the examiner had found certain deficiencies in Sentinel's loan underwriting policies and procedures. Those deficiencies were spelled out. The letter also stated that the examiner had commented on the lack of adequate documentation in the loan files with regard to loan extensions. According to Behrens, the examiner had found that extensions had been granted without obtaining appraisal updates or current financial information from the buyer. The letter requested the directors' assurances that appropriate procedures had been implemented to remedy the deficiencies spelled out in the examiner's report.

Behrens wrote the directors again on July 14, 1987, and stated that an examiner had found deficiencies in the underwriting of major loans, particularly with regard to two loans to one individual and two loans to another. Behrens also stated that the examiner noted that certain deficiencies in Sentinel's loan underwriting policies and procedures had not been remedied. Behrens acknowledged, however, that Sentinel had submitted revised policies and procedures on May 26, 1987 which currently were under review.

Behrens' affidavit states that he attended "several" meetings of Sentinel's Board of Directors and the Board's Credit Committee as a result of his concern about the operation of Sentinel. From his observation, "it appeared the Directors had delegated all responsibility for supervision and operation of Sentinel's affairs to its management, specifically President David Dennerline." Few specific facts are given to support this "observation." Behrens states that he attended a meeting on March 22, 1988, at which the individual directors showed little or no involvement. Behrens also alleges that he observed a board member sleeping and that his assistant observed two others nodding off during the meeting. The directors did not, according to Behrens, discuss Sentinel's financial condition during the meeting or ask more than a couple of questions.

Behrens wrote the directors again on August 22, 1988. The tone of this letter arguably is more urgent than the prior letters. Behrens stated that the examiner's recent report revealed "several matters of supervisory concern" requiring the directors' immediate attention. The examiner listed the directors' failure to correct deficiencies in Sentinel's lending policies and procedures as among the matters requiring immediate attention.

Due to his concern about Sentinel's problems, Behrens attended another board meeting on October 25, 1988. At that meeting, Behrens allegedly advised the directors that he had observed "a total lack of involvement by them during the meeting of March 22, 1988." He asserts that the same individual who fell asleep at the March 22 meeting, also fell asleep at the October 25 meeting.

Behrens' letter of November 30, 1988 again states, though without further explanation, that Sentinel lacked adequate lending policies and procedures. He met with the board's Audit Committee on that same date and, in a letter dated December 28, 1988, commented at length on deficiencies in Sentinel's lending policies and procedures.

Sentinel apparently submitted revised policies and procedures, and Behrens' letter of June 28, 1989 responded to the revisions. Behrens stated that the policies and procedures had remedied many of the earlier problems, but that several deficiencies still existed.

The RTC also has submitted the affidavit of Norman Katz, a consultant engaged primarily in consulting in the financial services industries. Katz, apparently being offered as an expert, states that he is "familiar with several of Sentinel's individual commercial loan files, including the files relating to the loans known as Cave Creek, Citrus Plaza, and Indian School." Katz further asserts that he reviewed Sentinel's loan policies and procedures as well as the correspondence

between the directors and regulatory agencies.

After reviewing these materials, Katz posits that the directors "did not exercise appropriate control and supervision over the operations of Sentinel and/or its management as a reasonably prudent director would have been expected to exercise under the circumstances during the period 1985 through 1989." Katz further opines that "the actions or inactions of the directors effectively resulted in the improper delegation of virtually all supervision and control over lending at the institution to Sentinel's senior management."

To support these broad assertions, Katz reasons as follows. First, he notes that Sentinel grew very fast. Rapid growth, he asserts, imposed a heightened responsibility on the directors to ensure that adequate policies and procedures were in place to control the growth. Second, he contends that the policies enacted by the directors in 1986 were deficient. He alleges that the policies focused on documentation rather than on how to analyze documents and that almost no underwriting criteria were identified for commercial lending. Katz asserts that the result of the directors' "inaction" was a commercial lending program typified by a character lending approach—i.e., loans were granted based on management's view of the character of the borrower. He asserts that management regularly allowed major loans to be extended, modified, and funded prior to director review and without adequate appraisals or other documentation and analysis of the status of the borrower. These practices, Katz maintains, reflect an utter lack of involvement and control by the directors over the extension of commercial loans by Sentinel. Katz further asserts that his review of the records reveals that the directors made little substantive change in response to the criticisms of the regulators.

Katz concludes that the directors' failure to fulfill their duty of care manifested itself in many ways, including the imprudent extension of especially risky loans. He then discusses the Citrus Plaza, Indian School, and Cave Creek loan transactions in an attempt to show why these transactions should not have been consummated as well as to show lack of director involvement in the transactions.

With regard to the Citrus Plaza loan, he asserts that the loan was approved by management even though the loan was in excess of management's approval limit. The loan then was funded prior to review by the Credit Committee, and eventually extended prior to approval by the board of directors. Katz asserts that the loan should not have been made on the basis of the documents reviewed by the directors.

With regard to the Indian School loan transaction, Katz concludes that this loan also was funded prior to board of director review. He asserts that the loan file contains inconsistent appraisals which should have led *management* to question the loan. In addition, he contends that the directors' approval of the loan was "imprudent" given the statement in the loan application that the borrower did not intend to develop the property.

Concerning the Cave Creek loan transaction, Katz argues that the original loan was granted without sufficient credit documentation, and was approved by management even though the loan was in excess of management's approval authority. Moreover, the loan was not approved by the Credit Committee until more than two weeks after management had given its initial approval. Katz asserts that the various underwriting deficiencies pointed out by him are representative of the deficiencies throughout Sentinel's commercial loan portfolio, and that the deficiencies resulted from the directors' failure to fulfill their duties of control and supervision over the affairs of Sentinel.

Last, the RTC submits the affidavit of Gerald Olson, who worked as an Executive Vice President and Chief Credit Officer at Sentinel from November 16, 1987 until approximately June 9, 1988. Olson asserts that he attended six Credit Committee meetings while at Sentinel and observed the directors to be "essentially passive." He states that he cannot recall any member of the committee ever asking a substantive question during the course of a loan presentation. He further asserts, without further elaboration, that

"there were virtually no policies and procedures for commercial lending which were formally discussed or followed at Sentinel during [his] tenure."

## B. *The Directors' Evidence*

Not surprisingly, the directors have submitted affidavits and evidence which paint a very different picture of their efforts as directors. First, the directors have submitted evidence showing that they regularly attended board meetings. Second, the directors each state that they considered all information reasonably available to them when evaluating whether to approve a loan. Third, the directors each state that, when approving each loan, they believed that doing so was a good business decision and that the loan would be repaid.

In addition, the directors have submitted the supplemental affidavit of William Was, the Chairman of the Sentinel Board of Directors. Was' affidavit, and exhibits attached to the affidavit, demonstrate that Sentinel's board of directors consistently responded in some manner to Behrens' concerns regarding lending policies and procedures and other matters. The letters normally assert that the problems identified by Behrens have been addressed, although the letters sometimes take issue with Behrens' or other regulators' criticisms.

Was also asserts that the Board of Directors never allowed management to fund a major commercial loan prior to review and approval by the directors. In addition, he asserts that no large commercial loan ever was funded without adequate review of the borrower, the project, and any additional collateral. He asserts that if such conduct ever did occur, it was not disclosed to the members of the board and likely was hidden from it, presumably by management.

Was also maintains that he and all the other board members were extremely active at board meetings and that substantive questions frequently were asked. He states that he and other board members met on numerous occasions with management to talk about Sentinel.

Attached to Was' supplemental affidavit are letters from Olson, then a Sentinel employee, to Behrens. In the letters, Olson complains about serious misconduct by Sentinel's President, David Dennerline. In the letters, Olson describes Dennerline as "extremely dangerous" and unethical. The letters are lengthy and set forth numerous examples of improper conduct, including attempts by Dennerline to deceive directors. Olson also expresses his fear that he is about to be terminated.

## III. *THE BUSINESS JUDGMENT RULE*

Compelling reasons exist for limiting the circumstances under which directors may be held personally liable. Directors, particularly bank directors, regularly make complex decisions involving risk, and many such decisions may appear in hindsight to have been made improvidently. Competent persons would not serve as directors if such decisions could lead to liability under ordinary tort standards. *See, e.g., Washington Bancorporation v. Said,* 812 F.Supp. 1256, 1258 (D.D.C.1993). In addition, our country's corporate system depends to a degree on the willingness of corporations to take risk. With large sums of money at stake—and the threat of litigation in the event of failure correspondingly high—few directors would recommend ventures involving more than minimal risk. *See* R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 4.6, at 4-38 (2d ed. & Supp.1993). These considerations, as well as others, have prompted courts to recognize rules limiting director liability. The most commonly invoked of these rules is known as the business judgment rule.

## A. *The Scope of the Business Judgment Rule*

The business judgment rule, stated generally, "precludes judicial inquiry into actions taken by a director in good faith and in the exercise of honest judgment in the legitimate and lawful furtherance of a corporate purpose." *Shoen v. Shoen,* 167 Ariz. 58, 65, 804 P.2d 787, 794 (1990); *see Kadish v. Phx. Scotts. Sports Co.,* 11 Ariz.App. 575, 578, 466

P.2d 794, 797 (1970). The rule thus applies if directors act in furtherance of a legitimate corporate purpose, in good faith, and after reasonably informing themselves. *See, e.g., Blumenthal v. Teets,* 155 Ariz. 123, 128, 745 P.2d 181, 186 (1987) (quoting *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984)) (applying Delaware law). Under the case law, a rebuttable presumption exists that each of these elements are present.

> It is a *presumption* that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in honest belief that the action taken was in the best interest of the company.... The burden is on the party challenging the decision to establish facts rebutting the presumption.

*Id.; see also Washington Bancorporation v. Said,* 812 F.Supp. 1256, 1268 (D.D.C.1993); 3A Stephen M. Flanagan & Charles R.P. Keating, *Fletcher Cyclopedia of the Law of Private Corporations* § 1041.4 (1986).

■ A major dispute between the parties regards the standards that must be met to overcome the presumption. The RTC contends that it need only show that the directors acted negligently in failing to inform themselves; the Campbells argue that gross negligence must be shown; and the other directors argue that self-dealing must be shown.

Despite the RTC's vigorous arguments to the contrary, it must prove gross negligence to overcome the presumption imposed by the business judgment rule. Although no Arizona case law is controlling, in *RTC v. Dean,* 854 F.Supp. 626, 635 (D.Ariz.1994), another judge of this district concluded that, under Arizona's version of the business judgment rule, gross negligence must be shown. This is the view of many other courts. *See, e.g., FDIC v. Mintz,* 816 F.Supp. 1541, 1546 (S.D.Fla.1993); *Blumenthal,* 745 P.2d at 186; *Smith v. Van Gorkom,* 488 A.2d 858, 872–73 (Del.1985). As set forth in the margin, the cases cited by the RTC do not support the proposition that a negligence standard applies under Arizona law.[2] In fact, the court could find no case in which a court held that the business judgment rule could be overcome by a showing of mere negligence. If it could, the rule would provide very little protection to directors. Thus, to the extent that the business judgment rule is applicable, the RTC must show that the directors, and each of them, were grossly negligent in informing themselves prior to making a decision.[3]

### B. Whether the RTC's Allegations of Abdication Take this Case Outside of the Business Judgment Rule

■ Many of the RTC's allegations in this case are not easily analyzed under typical formulations of the business judgment rule. The RTC alleges much more than that the board failed to inform itself before making a particular decision. Instead, the RTC con-

---

**2.** The first case cited by the RTC, *DePinto v. Provident Sec. Life Ins. Co.,* 374 F.2d 37 (9th Cir.), *cert. denied,* 389 U.S. 822, 88 S.Ct. 48, 19 L.Ed.2d 74 (1967), does not even discuss the business judgment rule. The court in that case rejected a former director's claim that a jury instruction invited the jury to find him liable for acts or omissions which, he asserted, were not at issue in the case. *Id.* at 47. The Ninth Circuit disagreed, finding that the acts and omissions were at issue. *Id.* The apparent basis for the RTC's argument is that the instruction suggested that the former director could be held liable for negligence. *Id.* at 40 n. 1. Given that the court did not even discuss whether that part of the instruction was accurate, *DePinto* cannot be read as concluding that a negligence standard governs whether liability may be imposed on a director. *See RTC v. Dean,* 854 F.Supp. 626, 635 (D.Ariz. 1994) (rejecting the RTC's argument that *DePinto* holds that directors in Arizona may be held liable under a negligence standard).

The second case cited by the RTC, *Jabczenski v. Southern Pac. Mem. Hosp.,* 119 Ariz. 15, 579 P.2d 53 (1979), discusses the circumstances in which directors can be held vicariously liable for conversion based on the conduct of the corporation or its officers. The court stated that "the directors must participate ... or be guilty of negligence in the management and supervision of the corporate affairs causing or contributing to the injury." *Id.* at 58. The court did not make this statement in the context of discussing liability for negligence or breach of duty, or in the context of the business judgment rule. The court, therefore, rejects the assertion that *Jabczenski* is relevant to this case.

**3.** The RTC does not allege that defendants acted in bad faith or for an illegitimate corporate purpose.

tends that the entire board effectively abdicated its duty to control and supervise Sentinel and that, therefore, this case is not governed by the business judgment rule.

On its face, the business judgment rule does not apply when abdication or omission is alleged: "[t]echnically speaking, [the rule] has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act." *Aronson*, 473 A.2d at 813.

The case law is murky regarding the standards that govern abdication cases. Although courts have stated that the rule technically does not apply in abdication cases, very few have explained what standards do govern such cases. What case law that does exist suggests that liability may not be imposed unless the directors engaged in something approaching a total abdication of their duties. *See Joy v. North*, 692 F.2d 880, 886 (2d Cir.1982) (stating that the business judgment rule does not apply when the corporate decision "results from an obvious and prolonged failure to exercise oversight or supervision"), *cert. denied*, 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983); *FDIC v. Benson*, 867 F.Supp. 512, 522 (S.D.Tex.1994) ("Moreover the business judgment rule will protect a director even if the acts are ultra vires; the acts must be grossly negligent or a complete abdication of the director's responsibility for liability to attach."); *RTC v. Acton*, 844 F.Supp. 307, 314–15 & n. 4 (N.D.Tex.1994) ("[T]he Texas business judgment rule restricts the liability of officers and directors to liability for acts of gross negligence, which may include the complete abdication of their responsibilities."); *RTC v. Bonner*, 1993 WL 414679, at *3 (S.D.Tex. June 3, 1993) (stating that the rule does not aid directors who totally abdicate their duties). One commentator, after an "extensive" study, concluded that liability is not imposed in the abdication context absent a pattern of exacerbated neglect amounting to an abandonment of duty. Charles Hansen, *The Duty of Care, the Business Judgment Rule, and The American Law Institute Corporate Governance Project*, 48 Bus.Law. 1355, 1360 (1993).

One decision, however, *Rabkin v. Philip A. Hunt Chem. Corp.*, 13 Del.J.Corp.L. 1210, 1987 WL 28436 (Del.Ch.1987), concluded that the standard in abdication/failure-to-act cases should be mere negligence. The court reasoned:

> [U]nder the business judgment rule, directors who undertake their decision making responsibility will not be held liable either for a fault in the decision making process or the decision itself unless they were grossly negligent. It does not seem logical to accord the same deference to directors who abdicate their managerial responsibilities. There would be little meaning to the business judgment rule if, in cases not implicating the duty of loyalty, directors were given the same protection whether it applies or not.

*Id.* at 1217, 1987 WL 28436 at *3–4. The court went on to hold that the single alleged act of failed oversight in that case stated a cause of action.

The court is not persuaded to follow *Rabkin*. The strict distinction drawn in *Rabkin* between cases involving director action and cases involving director inaction is not grounded in any stated principle and is actually inconsistent with the principles applied in the business judgment rule context. Notably, the gross negligence standard governs whether a director properly informed himself before making a decision. *Smith v. Van Gorkom*, 488 A.2d at 873. Even if instances of inaction are entitled to less protection than actual decisions, *Rabkin* makes no attempt to explain why the ordinary negligence standard governs claims based on alleged inaction. Application of an ordinary negligence standard not only would leave directors very vulnerable in a good number of cases, but also inevitably would undercut the intended efficacy of the business judgment rule by encouraging artful pleading. For example, in this case, the RTC does not base its claims on allegations that the directors made poor decisions in authorizing loans; instead, they argue that the directors failed to supervise Sentinel's lending program adequately which led to poor decisions—i.e., the extension of the loans. As such, in the absence of authority other than *Rabkin*, the court holds that

liability may not be imposed on the directors for mere negligence in the abdication context.

The court still must determine what standard governs abdication claims under Arizona law. The court concludes that the Arizona courts would not impose liability on directors in the abdication context unless their conduct amounted to gross negligence. *See Acton,* 844 F.Supp. at 314 n. 4 (stating that, under Texas law, total abdication would fall within the definition of gross negligence and, therefore, be actionable). This result is consistent with the case law other than *Rabkin,* which suggests that total abdication or gross negligence is necessary before liability may be, imposed. The standard also recognizes one of the dominant objectives underlying the business judgment rule—i.e., encouraging capable persons to serve as directors. Thus, the RTC may recover from defendants under their abdication theory only if they are able to establish that the directors acted grossly negligent in failing to perform their directorial duties.

#### C. *The Gross Negligence Standard*

No Arizona decision discusses the concept of gross negligence in the context of director liability. The Arizona courts have, however, defined the term in other contexts. The Arizona Court of Appeals has stated that "[g]ross negligence differs from ordinary negligence in quality and not degree." *Walls v. Arizona Dep't of Public Safety,* 170 Ariz. 591, 595, 826 P.2d 1217, 1221 (1991); *accord Kemp v. Pinal County,* 13 Ariz.App. 121, 124, 474 P.2d 840, 843 (1970). In another case, the Arizona Supreme Court stated that gross negligence "is highly potent and when it is present it fairly proclaims itself in no uncertain terms. It is 'in the air,' so to speak. It is flagrant and evinces a lawless and destructive spirit." *Cullison v. City of Peoria,* 120 Ariz. 165, 169, 584 P.2d 1156, 1160 (1978). The thrust of the decisions has been that a person can be very negligent, yet still not be guilty of gross negligence. *See Kemp v. Pinal County,* 474 P.2d at 843–44.

#### D. *Analysis*

■ The court has carefully reviewed the RTC's evidence and arguments and concludes that, as a matter of law, the record is not capable of supporting a finding of gross negligence against any of the directors. Defendants did not act grossly negligent in either informing themselves before making a particular decision or in fulfilling their directorial responsibility of overseeing Sentinel's commercial lending program. As such, they cannot be held liable.

The RTC's main argument focuses on the directors' alleged failure to enact adequate lending policies and procedures. Each of the directors testified that Sentinel enacted lending policies and procedures during their tenure. Although the Behrens affidavit and accompanying exhibits demonstrate that regulators consistently had problems with the policies and procedures, the exhibits also make clear that Sentinel at least addressed each of the regulator's concerns and remedied many of them. The exhibits attached to the supplemental Was affidavit similarly refute the notion that the directors ignored the regulators' criticisms concerning the policies and other issues. The RTC also submits the Katz affidavit in an attempt to demonstrate that the directors enacted deficient policies. Enacting deficient policies, however, falls well short of acting grossly negligent and certainly does not demonstrate abdication.

In his affidavit, Katz also concludes that the directors "did not exercise appropriate control and supervision over the operations of Sentinel and/or its management as a reasonably prudent director would have been expected to exercise under the circumstances during the period 1985 through 1989." Assuming without deciding that this opinion constitutes admissible evidence, it is notable that the opinion does not accuse the directors of gross negligence. Katz' criticism of specific loans made by Sentinel also is insufficient to support a finding of gross negligence. To the extent that his criticisms are aimed at the directors instead of management, they simply show that Sentinel may have made some improvident loans.

The evidence submitted by the RTC intended to show that board members did nothing at board meetings also is unavailing. That Behrens and Olson attended a handful

of board meetings and regarded the directors to be passive at those meetings does not create a genuine issue of material fact. The uncontroverted evidence is that the directors attended board meetings and that they reviewed and considered relevant and sufficient materials when making decisions regarding commercial loans. Given this evidence, the dispute between the parties about the extent of their involvement at the meetings themselves is insufficient to establish gross negligence.

In sum, the evidence simply does not support the broad allegations made by the RTC in its papers that the board simply abdicated its functions. Nor is the evidence capable of supporting a finding that the directors acted grossly negligent.

The court's decision is consistent with the decisions of other courts faced with similar facts. For example, in *FDIC v. Dawson*, 4 F.3d 1303, 1311–12 (5th Cir.1993), *cert. denied* —— U.S. ——, 114 S.Ct. 2673, 129 L.Ed.2d 809 (1994) the FDIC asserted, as the RTC does here, that the board of directors had improperly delegated lending responsibilities to management. To support its claim, the FDIC submitted the affidavit of an expert who criticized the delegation of lending duties and noted that regulators had commented on deficiencies in the bank's lending operations. *Id.* at 1311. The Fifth Circuit held that such evidence showed only mere negligence. *Id.* at 1311, 1312–13 & n. 4.

Similarly, in *FDIC v. Benson*, the FDIC alleged that the directors allowed officers to fund insider loans without first obtaining approval from the board of directors as required by law. 867 F.Supp. 512, 522. The court concluded that the FDIC's evidence, which apparently included evidence of warnings from regulators, *see id.*, stated no more than a cause of action for negligence, *id.* at 522, 523.

Thus, the court concludes that summary judgment must be granted with regard to all of the RTC's claims.

## IV. *STATUTES OF LIMITATIONS*

■ The defendants also argue that the RTC's claims are barred by the applicable statute of limitations, which, defendants assert, is two years. Defendants argue that the limitations period began to accrue at the time the directors approved the allegedly improper loans and expired two years later, prior to the time that the RTC was named receiver. State law claims that are barred before a financial institution enters receivership are not revived by the appointment of the RTC or the FDIC as receiver. *See FDIC v. McSweeney*, 976 F.2d 532, 534 (9th Cir.1992), *cert. denied*, 508 U.S. 950, 113 S.Ct. 2440, 124 L.Ed.2d 658 (1993).

The RTC asserts that the applicable statute of limitations is four years. Alternatively, the RTC contends that the two-year limitations period did not begin to accrue until damages occurred—i.e., when the loan was declared in default or a loss. As another alternative, the RTC asserts that the limitations period was tolled pursuant to the adverse domination doctrine. Under the RTC's federal common law version of the adverse domination doctrine, a statute of limitations does not begin against a corporation's directors as long as the culpable directors control the board.

### A. *The Applicable Limitations Period*

■ The directors assert that the RTC's negligence, gross negligence, and breach of duty claims, to the extent they are separate claims, are subject to the two-year limitations period set out in A.R.S. § 12–542. The directors assert that the RTC's negligence per se claim is governed either by section 12–542 or the one-year period of A.R.S. § 12–541(3) (liability created by statute). The RTC contends that A.R.S. § 12–550 applies. Section 12–550 sets a four-year limitations period for actions not falling under other statutes of limitations.

Section 12–542 states:

Except as provided in § 12–551 there shall be commenced and prosecuted within two years after the cause of action accrues, and not afterward, the following actions:

1. For injuries done to the person of another including causes of action for medical malpractice as defined in § 12–561.

2. For injuries done to the person of another when death ensues from such injuries, which action shall be considered as accruing at the death of the party injured.

3. For trespass for injury done to the estate or the property of another.

4. For taking or carrying away the goods and chattels of another.

5. For detaining the personal property of another and for converting such property to one's own use.

6. For forcible entry or forcible detainer, which action shall be considered as accruing at the commencement of the forcible entry or detainer.

Presumably, defendants rely on subsection 3 when claiming that this section applies to the claims in this case.

One case cited by defendants, *Sato v. Van Denburgh*, 123 Ariz. 225, 599 P.2d 181 (1979), strongly implies that section 12–542 applies to the causes of action pled in the RTC's Complaint. Sato alleged that his accountant had performed negligently, apparently to Sato's detriment. *Id.*, 599 P.2d at 183. The trial court, and later the Supreme Court, agreed with the accountant that Sato's claim was barred by section 12–542. The Supreme Court referred to section 12–542 as the "tort or negligence statute," and then concluded that "the essence of a complaint for the negligent performance of professional services by an accountant sounds in tort." *Id.* Although the court acknowledged the Arizona rule that the longer statute of limitations should be applied when there is doubt, the court found that Sato's claim clearly sounded in tort and, therefore, was governed by section 12–542. *Id.*

■ The *Sato* decision clearly implies that tort claims are governed by section 12–542, regardless of whether the specific actions pled in the complaint are equivalent to the actions described in section 12–542. The RTC argues that the Ninth Circuit has held that breach of fiduciary duty claims against former directors of an Oregon bank could be characterized as arising in contract. *See FDIC v. Former Officers and Directors of Metropolitan Bank*, 884 F.2d 1304 (9th Cir. 1989), *cert. denied*, 496 U.S. 936, 110 S.Ct.

3215, 110 L.Ed.2d 662 (1990). In Arizona, however, the law is that the "essential nature of actions to recover for breach of [professional] duties is not one 'arising in contract' but rather one arising out of tort—breach of legal duties imposed by law." *Barmat v. John and Jane Doe Partners A–D*, 155 Ariz. 519, 523, 747 P.2d 1218, 1222 (1987). Although *Barmat* was not a statute of limitations case, the Arizona Supreme Court made clear its belief that actions for breach of professional duties are tort actions. The court, therefore, is confident that the Arizona Supreme Court would hold that Arizona's "tort or negligence" statute of limitations would apply to the RTC's claims.

**B.  *Accrual***

■ The defendants contend that the limitations period began to accrue when the loans allegedly were improperly approved. According to defendants, regulators knew of improprieties regarding the loan, or had the ability to discover the improprieties, when the loans were made or soon afterwards. Defendants cite a number of cases that in fact adopt the proposition that a cause of action on an improper loan accrues when the loan is made. *See, e.g., Corsicana Nat'l Bank v. Johnson*, 251 U.S. 68, 86, 40 S.Ct. 82, 89–90, 64 L.Ed. 141 (1919); *RTC v. Acton*, 844 F.Supp. 307, 316–17 (N.D.Tex.1994); *see also Farmers & Merchants Nat'l Bank v. Bryan*, 902 F.2d 1520, 1522 (10th Cir.1990) ("In general, a cause of action on an improper loan accrues at the time the loan is made.").

The RTC argues that it is unfair to require the government or shareholders to bring suit until default occurs or the loan is declared a loss. According to the RTC, some loans do not require interest or principal payments until maturity and that transactions often are modified or restructured to postpone a default. Thus, the RTC claims, concrete injury does not occur until default occurs or the loan is declared a loss. Because the negligence limitation period does not accrue under Arizona law until some injury has occurred, *see Dryden v. Bell*, 158 Ariz. 164, 167, 761 P.2d 1068, 1071 (1988), then, the RTC claims, under Arizona law a cause of action based on

the approval of a bad loan should not accrue until the loan has not been paid back.

To the extent that the RTC's argument focuses on loss rather than conduct, it is not without some force. Actions brought as a result of the approval of imprudent loans might very well turn out to be moot if the loan nevertheless is repaid. The incentive to bring suit based on the imprudent approval of a loan, other than to avoid limitations problems, is very low until the loan has gone into default or been declared a loss.

██ Notwithstanding these considerations, director approval of bad loans is not something that cannot be discovered until default occurs, assuming that nothing is done to conceal the circumstances surrounding the loan approvals. In fact, as made clear by the RTC's evidence, federal regulators were aware of allegedly bad loans made by Sentinel long before default. In addition, banks sustain injury as soon as bad loans are funded: money that should not have left the bank is gone. The general rule is that "a statute of limitations begins to run against an action against directors of a corporation for malfeasance or nonfeasance from the time of the perpetration of the wrongs complained of." *FDIC v. Dawson*, 4 F.3d 1303, 1308 (5th Cir.1993) (citing 3A Stephen M. Flanagan & Charles R.P. Keating, *Fletcher Cyclopedia of the Law of Private Corporations* § 1306 (1986)). No Arizona case cited to the court calls into question the general rule. Thus, the court concludes that the cause of action accrued at the time the allegedly bad loans were made.

### C. *The Doctrine of Adverse Domination*

██ The RTC also argues that the doctrine of adverse domination tolled the limitations period. This doctrine, to the extent it is applicable, serves to toll limitations periods while the subject corporation is under the domination of the alleged wrongdoers. *See, e.g., Dawson*, 4 F.3d at 1308.

The first issue regarding the doctrine that the court must resolve is whether Arizona law or federal common law controls on the issue of adverse domination in cases brought by the RTC. Some courts have held that the issue is governed by state law. *See, e.g., RTC v. Artley*, 28 F.3d 1099, 1102 (11th Cir.1994); *FDIC v. Cocke*, 7 F.3d 396, 400 (4th Cir.1994), *petition for cert. filed*, 62 U.S.L.W. 3659 (March 21, 1994); *Dawson*, 4 F.3d at 1308. Other courts have held that federal common law governs. *See Farmers and Merchants Nat'l Bank v. Bryan*, 902 F.2d 1520, 1523 (10th Cir.1990); *RTC v. Dean*, 91–2026 PHX EHC, at 12 (D.Ariz. July 20, 1993).

Although not on point, the Supreme Court's recent decision in *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), makes clear that state law governs the adverse domination issue. In *O'Melveny*, the Court addressed the issue of whether, in a suit brought by the FDIC, federal law or state law governs the tort liability of attorneys who provided services to the bank. *O'Melveny & Myers v. FDIC*, 512 U.S. 79, ——, 114 S.Ct. 2048, 2051, 129 L.Ed.2d 67 (1994). The Court first rejected the argument that FIRREA provided support for displacing state law. *Id.*, 512 U.S. at ——, 114 S.Ct. at 2054. The Court reasoned that given that the statute explicitly preempts state law in certain instances, it cannot be read to permit further displacement of state law. *Id.* The Court then addressed when federal interests constitute grounds for displacement. The Court stated that displacement is appropriate only in "extraordinary" cases in which there is a " 'significant conflict between some federal policy or interest and the use of state law.' " *Id.* at ——, 114 S.Ct. at 2055–56 (source omitted). The Court specifically stated that permitting maximum recovery by the FDIC is not a sufficient reason to displace state law. *Id.* at ——, 114 S.Ct. at 2055.

*O'Melveny* makes clear that federal common law is to be applied only sparingly, and not simply whenever doing so would serve the general interests of entities like the RTC. The RTC puts forth no other federal interest that would justify applying a rule of federal common law. Instead, the RTC relies on the unreported decision in *Dean*. Notwithstanding the Tenth Circuit's decision in *Bryan* which the court cited in *Dean*, the reported case law both before *O'Melveny, see, e.g.,*

*Dawson*, 4 F.3d at 1309, and after, *see Artley*, 28 F.3d at 1102, refutes the notion that federal common law controls the adverse domination issue. The court, therefore, will examine Arizona law when determining whether the adverse domination doctrine applies in this case.

■ No Arizona decision adopts the doctrine of adverse domination. The doctrine, however, is recognized in numerous other jurisdictions in varying forms. *See, e.g.,* Pl's.Opp. to Defs.' Mot. for S.J. at 20 n. 13 (collecting numerous cases). Moreover, Arizona courts have stated that limitations periods are to be tolled when discovery of wrongdoing cannot reasonably be expected. *See, e.g., Nielson v. Arizona Title Ins. & Trust Co.*, 15 Ariz.App. 29, 485 P.2d 853 (1971). The court, therefore, concludes that the Arizona courts would recognize the doctrine of adverse domination in cases in which directors' control of a corporation reasonably prevented others from discovering the directors' wrongdoing.

■ The court disagrees with the RTC, however, that all the RTC must show is that the directors somehow were culpable and that they constituted a majority of the board. In most cases decided under state law the adverse domination doctrine is not applied unless there are allegations that the directors had been active participants in wrongdoing or fraud. *See Dawson*, 4 F.3d at 1312 (reviewing California and Texas law on adverse domination). The doctrine itself is founded on the presumption that those who engage in fraudulent activity likely will make it difficult for others to discover their misconduct. *See RTC v. David*, No. C–93–3594 SAW, at 4–5 (N.D.Cal. Mar. 3, 1994). The presumption, therefore, does not apply with equal force in cases in which intentional misconduct is not alleged. Moreover, no concealment is asserted nor could it be because Olson advised the RTC of the claimed conduct of board members and, also, that Dennerline hid information from the board.

■ Although the court holds that more than mere negligence must be shown, it is not necessary for the court to determine exactly what showing must be made before the doctrine may be applied. *See Dawson*, 4 F.3d at 1312–13 & n. 4. The court already has concluded that the RTC's evidence establishes no more than mere negligence. The doctrine of adverse domination, therefore, does not constitute grounds for tolling the statute of limitations. Defendants' motion for summary judgment on limitations grounds, therefore, is granted.

Given the court's conclusion that the RTC's evidence is not sufficient to support its claims and that seven of the ten loans at issue are time-barred, it is not necessary for the court to address whether the Campbell defendants can be held liable for loan transactions occurring after Campbell resigned as a director of Sentinel. It also is unnecessary for the court to address the director-defendants' argument that they cannot be held liable for one of the loan transactions due to misrepresentations made by the borrowers involved in those transactions.

IT IS ORDERED granting the RTC's motion to submit a supplemental post-hearing memorandum (Doc. 188). The court has considered the memorandum and the response to that memorandum filed by the Campbell defendants.

IT IS FURTHER ORDERED granting the Campbells' motion for summary judgment (Doc. 124), which was joined in by the other defendants.

IT IS FINALLY ORDERED that this order terminates the case. The Clerk of the Court is directed to enter judgment accordingly.