128 P.3d 756

**UNITED DAIRYMEN OF ARIZONA, an Arizona corporation, Plaintiff/Counterdefendant/Appellee,**

v.

**Michael K. SCHUGG and Debra L.B. Schugg, husband and wife, Defendants/Counterclaimants/Appellants.**

No. 1 CA–CV 04–0611.

Court of Appeals of Arizona, Division 1, Department B.

Feb. 9, 2006.

---

Squire Sanders & Dempsey LLP by George I. Brandon, Cynthia A. Ricketts, Brian M. McQuaid, Mitchell W. Fleischmann, Phoenix, Attorneys for Plaintiff/Counterdefendant/Appellee.

Robbins & Green PA by Brian Imbornoni, Phoenix, Attorneys for Defendants/Counterclaimants/Appellants.

## OPINION

WINTHROP, Presiding Judge.

¶ 1 Michael K. Schugg and Debra L. Schugg ("the Schuggs") appeal from a judgment for liquidated damages in favor of the United Dairymen of Arizona ("UDA"). They also appeal from summary judgment on various counterclaims. For the reasons that follow, we find that the trial court improperly authorized an award of liquidated damages for breach of the implied covenant of good

faith and fair dealing and reverse the judgment. We also find that genuine issues of material fact precluded summary judgment on two of the Schuggs' counterclaims and we remand for further proceedings.

## I.  FACTS AND PROCEDURAL BACKGROUND

¶ 2 This case involves a dispute between UDA, an agricultural milk marketing cooperative association and its former members, the Schuggs. The Schuggs operated a dairy known as Schuburg Holsteins. On October 27, 1988, the Schuggs signed a UDA Membership Agreement ("the Agreement") giving UDA the exclusive right to market their milk.[1] The Agreement provides for termination 1) when either party gives written notice of an intent to cancel not more than 90 or less than 60 days prior to the anniversary of the Agreement's effective date, or 2) upon the occurrence of other events listed in the bylaws, such as a Member's resignation, or the dissolution, merger, or consolidation of a Member's business. Pursuant to UDA's bylaws, the Agreement requires members to deliver to UDA all milk produced by cows that a member owns, possesses or controls, and also sets liquidated damages[2] in the event of a member's breach:

2.  During the term of this Agreement, *the Member agrees to deliver all Grade A milk produced by dairy cows that he owns, possesses or controls,* except milk used for home consumption, to such persons and at such place or places and in such manner as the Association may designate.... (Emphasis added.)

\* \* \* \*

10.  The Member hereby agrees that if at any time *while this Agreement is in force and effect, he neglects or refuses to deliver all milk produced by him . . . as may be designated from time to time by the Association, then, in that event, the Member*

---

1.  The Arizona Cooperative Marketing Act, Arizona Revised Statutes ("A.R.S.") sections 10–2001 to –2025 (2004) allows agricultural producers to form cooperative associations and enter into exclusive marketing contracts with their members.  A.R.S. § 10–2016(A).

2.  The Arizona Cooperative Marketing Act allows the exclusive marketing contracts to provide for liquidated damages, when authorized in the association's bylaws.  A.R.S. § 10–2016(D).

*will pay to the Association a sum of money equal to forty percent of the gross sale price of such milk as the Member may deliver to any person or persons or at any place or in any manner not designated by the Association or otherwise in violation of the agreement.* This payment is not and shall not be construed as a penalty or forfeiture, but is agreed upon as liquidated damages, since it is agreed by the Member and the Association that the damages which the Association will suffer by reason of such neglect or refusal is difficult of specific ascertainment. . . . (Emphasis added.)

¶ 3 On September 28, 2001, the Schuggs informed UDA that they were no longer in business, and that UDA should stop picking up their milk. The Schuggs claimed that they sold their milk-producing cows and leased their dairy facility to S & T Dairy, L.L.C. ("S & T"), a company formed by their adult children.[3] S & T marketed its milk through a rival milk cooperative, Maverick Milk Producers Association ("Maverick").

¶ 4 On December 31, 2001, UDA filed a complaint against the Schuggs alleging breach of the Agreement. UDA later amended its complaint to add claims for breach of the implied covenant of good faith and fair dealing, fraudulent misrepresentation, negligent misrepresentation, and claims against the Schugg children. UDA contended that the creation of S & T was a sham transaction to enable the Schuggs to market their milk through Maverick and avoid waiting until the next anniversary date to terminate their UDA membership. UDA alleged that the Schuggs remained in possession and control of the dairy and requested an award of liquidated damages pursuant to Paragraph 10 of the Agreement based on the amount of milk S & T sold from October 1, 2001 through October 27, 2002. UDA also requested liquidated damages for breach of the implied covenant of good faith and fair dealing.

¶ 5 The Schuggs denied liability, and asserted counterclaims for breach of contract,

breach of the implied covenant of good faith and fair dealing, breach of fiduciary duties, intentional interference with contract, and unjust enrichment. As more fully discussed below, these claims arose out of UDA's requirement that members "dump" their milk production for several months, and UDA's decision to table the Schuggs' Applications for Base Transfer in 2001.

¶ 6 Prior to trial, the court entered summary judgments dismissing UDA's claims for fraudulent and negligent misrepresentation, and each of the Schuggs' counterclaims. The parties stipulated to dismiss the claims against the Schugg children. UDA's remaining claims for breach of contract and breach of the implied covenant of good faith and fair dealing were tried to a jury.

¶ 7 At the close of UDA's evidence, the Schuggs moved for judgment as a matter of law ("JMOL") on UDA's claim for breach of the implied covenant of good faith and fair dealing because UDA had not presented any evidence of actual damages. The Schuggs argued that a jury could find a breach of the implied covenant without finding a violation of Paragraphs 2 and 10 of the Agreement. Thus, absent such violation, the jury could not award liquidated damages. The Schuggs contended that because UDA failed to present evidence of ordinary contract damages, it failed to present a *prima facie* case for such a claim.

¶ 8 The trial court denied the Schuggs' motion, concluding that liquidated damages were available for a breach of the implied covenant of good faith and fair dealing, and both claims were submitted to the jury. The court instructed the jury that in order to succeed on its breach of contract claim, UDA had to prove that the Schuggs materially breached the Agreement. It instructed the jury to award liquidated damages calculated pursuant to the Agreement if they found breach of the Agreement.

¶ 9 The court further instructed the jury that to succeed on the breach of the implied covenant of good faith and fair dealing claim,

---

**3.** As of September 2001, the Schuggs' children were 21 and 19 years of age, and were enrolled in out-of-state colleges.

UDA had to prove that the Schuggs intentionally impaired the benefits that should have flowed to UDA under the agreement, and that they committed this breach when they started shipping their milk to Maverick. The court also instructed the jury that if they found a breach of the implied covenant, they must award liquidated damages as set forth in the Agreement.

¶ 10 The jury returned two verdict forms: one finding that the Schuggs did not breach the Agreement, the other finding that the Schuggs breached the implied covenant of good faith and fair dealing. As directed by the court's instructions, the jury awarded liquidated damages to UDA on this claim in the amount of $1,034,350.18.

¶ 11 The Schuggs renewed their motion for judgment as a matter of law, and alternatively, requested a new trial. The trial court denied these motions and ultimately awarded $938,453.61 as costs and attorneys' fees to UDA. The Schuggs timely appealed.[4] We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 12–2101(B) (2003) and –2102(F)(1) (2003).

## II. UDA'S CONTRACT CLAIMS

■ ¶ 12 On appeal, the Schuggs argue that the trial court erred in authorizing an award of liquidated damages for the breach of the implied covenant of good faith and fair dealing claim. UDA initially contends that the Schuggs did not object to the jury instructions and thus have waived their right to challenge the submission of those instructions on appeal. We disagree. The Schuggs are not appealing the form of jury instructions. They filed a motion for JMOL to prevent the court from submitting UDA's claim for breach of the implied covenant of good faith and fair dealing to the jury. Accordingly, the Schuggs properly preserved their right on appeal to challenge the trial

court's ruling as it relates to the submission of this claim to the jury.

### A. UDA's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

¶ 13 We review *de novo* the trial court's denial of a motion for JMOL. *Monaco v. HealthPartners of S. Ariz.*, 196 Ariz. 299, 302, ¶ 6, 995 P.2d 735, 738 (App.1999). UDA contends that the trial court properly denied the Schuggs' motion because liquidated damages are recoverable for breach of the implied covenant of good faith and fair dealing. UDA asserts that liquidated damages were recoverable not only under Paragraph 10 of the Agreement, but also under the liquidated damages provision of UDA's bylaws.[5]

¶ 14 Although UDA's First Amended Complaint contains a claim for violation of the bylaws, UDA did not present this issue to the jury, nor did it request an instruction on this claim. Accordingly, the jury could not have awarded liquidated damages pursuant to UDA's bylaws. We therefore need consider only whether liquidated damages are recoverable under our common law for breach of the implied covenant of good faith and fair dealing.

■ ¶ 15 All contracts as a matter of law include the implied duties of good faith and fair dealing, and contract damages are available for their breach. *E.g., Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund,* 201 Ariz. 474, 490–91, ¶¶ 59–60, 38 P.3d 12, 28–29 (2002); *Rawlings v. Apodaca,* 151 Ariz. 149, 153–54, 726 P.2d 565, 569–70 (1986); *Enyart v. Transamerica Ins. Co.,* 195 Ariz. 71, 76, 985 P.2d 556, 561 (App.1998). A party can breach the implied covenant of good faith and fair dealing without breaching an express provision of the underlying contract.

---

4. UDA has not cross-appealed from the jury verdict finding that the Schuggs did not breach paragraph 2 of the Agreement.

5. The bylaws provide in part:
   Article X, Section 2. Enforcement of agreement. The Association may, in the event of a breach of the marketing agreement executed by its Members, whether provided in the mar-

keting agreement or not, exercise any or all of the following remedies in law or equity.
   (a) Liquidated Damages. Recover as liquidated damages specific sums from Members breaching any provisions of the marketing agreement regarding the sale, delivery or withholding of products called for in the agreement. . . .

*See Beaudry v. Ins. Co. of the West,* 203 Ariz. 86, 91, ¶ 18, 50 P.3d 836, 841 (App.2002) (quoting *Wells Fargo Bank,* 201 Ariz. at 491, ¶ 64, 38 P.3d at 29).

¶ 16 Express contract provisions governing remedies or damages are generally binding on the parties. *Dixon v. City of Phoenix,* 173 Ariz. 612, 618, 845 P.2d 1107, 1113 (App.1992). The right to recover liquidated damages is limited by the express terms of the parties' agreement. *See Deuel v. McCollum,* 1 Ariz.App. 188, 191, 400 P.2d 859, 862 (1965) (reversing an award of liquidated damages because the plaintiff failed to prove a violation of the specific condition necessary to recover liquidated damages); *Hilb, Rogal & Hamilton Co. of Ariz. v. McKinney,* 190 Ariz. 213, 217, 946 P.2d 464, 468 (App.1997) (finding that liquidated damages were not available because no breach of the contract provision gave rise to such damages).

¶ 17 Liquidated damages provisions in a cooperative marketing agreement have likewise been limited to the express terms of that agreement. *See Staple Cotton Coop. Ass'n v. Pickett,* 326 So.2d 337, 339 (La.1976) (finding that a liquidated damages provision "has no application" absent evidence that defendant "marketed or otherwise disposed of" his crop in violation of express terms of stipulated damages clause); *Olson v. Biola Co-op. Raisin Growers Ass'n,* 33 Cal.2d 664, 204 P.2d 10, 17 (1949) (reversing an award of liquidated damages where plaintiff cooperative proved that a product was of poor quality, but did not prove that the member failed to deliver the product as required by the express terms of stipulated damages clause). In light of these principles, the trial court should have granted the Schuggs' motion for JMOL on UDA's claim for breach of the implied covenant of good faith and fair dealing.

¶ 18 In opposing the Schuggs' motion for JMOL, UDA contended that because the jury instructions on breach of the implied covenant related that breach to "when *they* started shipping *their* Grade A milk to Maverick . . ." (emphasis added), the jury implicitly found that the Schuggs refused to deliver milk over which they had possession or control, as set forth in Paragraphs 2 and 10 of the Agreement. Initially, we note that this contention references a jury instruction, fashioned by the court and counsel, and not a form of verdict, or special interrogatory adopted by the jury. More importantly, we cannot presume that the jury reached that conclusion in light of its unambiguous verdict finding no breach of the Agreement.

¶ 19 A reviewing court must search for a reasonable way to read the verdicts as expressing a coherent view of the case, and it must exhaust this effort before it disregards the jury's verdicts. *See Standard Chartered PLC,* 190 Ariz. at 39, 945 P.2d at 350 (*as corrected on denial of reconsideration*) (quoting *Toner v. Lederle Lab.,* 828 F.2d 510, 512 (9th Cir.1987), *cert. denied,* 485 U.S. 942, 108 S.Ct. 1122, 99 L.Ed.2d 282 (1988)). We find that the jury's verdicts were not inconsistent. *See Walter v. Simmons,* 169 Ariz. 229, 234, 818 P.2d 214, 219 (App.1991) (finding that jury verdicts that find a breach of the implied covenant of good faith and fair dealing, but no breach of contract are not necessarily inconsistent).

¶ 20 A party can breach the implied covenant of good faith and fair dealing by acting in ways not expressly included in the contract but which nonetheless bear adversely on the other party's reasonably expected benefits of the bargain. *Bike Fashion Corp. v. Kramer,* 202 Ariz. 420, 424, ¶ 14, 46 P.3d 431, 435 (App.2002). *Accord Wells Fargo Bank,* 201 Ariz. at 491–92, ¶¶ 65–66, 38 P.3d at 29–30; *Southwest Sav. & Loan Ass'n v. SunAmp Sys., Inc.,* 172 Ariz. 553, 558–59, 838 P.2d 1314, 1319–20 (App.1992). Here, the jury could have found that although the Schuggs did not own, possess, or control dairy cows, and thus did not violate the terms of Paragraph 10, they intentionally transferred possession and control of the cows to S & T to deprive UDA of the benefits it would otherwise have under the Agreement.

¶ 21 Because the right to liquidated damages depended upon a breach of Paragraph 2 of the Agreement, UDA had no right to recover liquidated damages for breach of the implied covenant of good faith and fair

dealing. Ordinary contract damages were the proper measure of damages for this breach. *Enyart,* 195 Ariz. at 76, 985 P.2d at 561 (stating that, ordinarily, a party claiming breach of an implied covenant of good faith and fair dealing is limited to contract damages). However, UDA presented no evidence to support an award of contract damages. Moreover, because UDA did not prove any contract damages, we are constrained from remanding for a new trial on this claim. When a party has chosen not to present evidence that could support the proper recovery for its claim, remand on that claim is not justified. *See Home Builders Ass'n of Cent. Ariz. v. City of Scottsdale,* 187 Ariz. 479, 484–85, 930 P.2d 993, 998–99 (1997) (finding that remand was unwarranted where plaintiff challenged a municipal development fee only on the basis that it failed to confer a benefit as required by statute, but raised no issue as to the reasonableness of that fee). *See also Crouch v. Truman,* 84 Ariz. 360, 362, 328 P.2d 614, 615 (1958) (finding that a party who had a full and complete opportunity to develop its case, but did not do so, was not entitled to a new trial to permit it to do what it should have done earlier); *Shetter v. Rochelle,* 2 Ariz.App. 607, 609, 411 P.2d 45, 47 (1966) (finding that reversal with judgment for the opposing party was proper when a party presented no evidence relating to an essential element of the claim and there was no interference by the trial court to prevent the party from developing the case). Thus, UDA failed to present a *prima facie* claim for breach of the implied covenant of good faith and fair dealing, and we reverse and vacate the jury's award.[6]

### III. THE SCHUGGS' COUNTERCLAIMS

*A. The Schuggs' Counterclaims Regarding UDA's Obligation to Market Milk*

¶ 22 In its Membership Agreement, UDA agreed to market "all Grade A milk" produced by its members, and to use its "best efforts" to market the milk in a manner it deemed to be to the best advantage of its members, including the Schuggs. For many years, UDA's principal customers (or "handlers" in the industry jargon) for milk bottled and sold in fluid form were Shamrock Farms, Kroger Company and Safeway, Inc. In an effort to enhance revenue, UDA joined with other milk-marketing cooperatives in other states (such as the Western Milk Marketing Agency, or "WMMA") in agreements not to sell milk to these customers until they agreed to pay a substantial premium above the federally regulated prices.

¶ 23 UDA's two largest customers, Kroger and Shamrock, refused to pay the requested premiums and, as a result, UDA was unable to market millions of pounds of Grade A milk produced by its members, including the Schuggs. As a further result of UDA's strategy, the Schuggs were forced to dump hundreds of thousands of pounds of their Grade A milk. UDA apparently treated the milk dumped by its members as if it had been sold when computing its pay prices to its members. To make these payments, UDA incurred substantial debt, which in turn led UDA to impose an assessment on its members' milk production. The amount assessed against the Schuggs' milk production was in excess of $232,000. Additionally, the Schuggs claim that UDA "wrote off" almost $34,000 in equity credits that the Schuggs earned, which UDA had retained in a revolving fund for the fiscal year ending September 30, 2000.

¶ 24 In their counterclaims, the Schuggs alleged that UDA not only committed antitrust violations, but also breached its contractual obligation to market its members' Grade A milk when it effectively forced members to dump their milk, rather than deliver it to UDA's primary milk customers. These alleged wrongful acts were also the basis for

---

6. Because we reverse on the basis that UDA failed to establish a *prima facie* case for breach of the implied covenant of good faith and fair dealing, we do not address whether A.R.S. § 10–2016 abrogates common-law principles barring enforcement of liquidated damages provisions as penalties when the fixed amount is not a reasonable prediction of just compensation for the harm. *See, e.g., Larson–Hegstrom & Assoc. v. Jeffries,* 145 Ariz. 329, 333, 701 P.2d 587, 591 (App.1985). For the same reason, we also do not consider claims that the trial court erred in ruling on the admission of evidence relating to such contract claims.

**140**

the Schuggs' claims that UDA acted in bad faith and breached its fiduciary duties.

¶ 25 Prior to trial, UDA moved for summary judgment on these counterclaims. The trial court granted summary judgment, finding that UDA's marketing decisions were not actionable, and/or that the evidence presented by the Schuggs on these claims was not strong enough to survive the *Orme School* standard.

¶ 26 Summary judgment is proper if the evidence presented by the party opposing the motion contains so little probative value, given the required burden of proof, that reasonable people could not agree with that party's conclusions. *Orme Sch. v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). In reviewing a grant of summary judgment, we determine *de novo* whether any genuine issues of material fact exist and whether the trial court erred in applying the law. *Bothell v. Two Point Acres, Inc.*, 192 Ariz. 313, 316, 965 P.2d 47, 50 (App.1998). We consider the record in the light most favorable to the party against whom summary judgment has been entered. *Great Am. Mortgage, Inc. v. Statewide Ins. Co.*, 189 Ariz. 123, 124, 938 P.2d 1124, 1125 (App.1997).

¶ 27 In their motion for summary judgment, the Schuggs argued that by paying out monies that had not been received from customers, UDA was incurring substantial indebtedness to its primary lender. They asserted that this harmed members because UDA later required them to compensate for that indebtedness by paying assessments. The Schuggs also claimed other financial losses resulting from UDA's "dumping policy."

¶ 28 We first consider whether any evidence supported the Schuggs' claim that UDA did not "market" the members' milk. The Schuggs equate "market" with "sell" and argue that by failing to sell the milk to its customers, UDA breached the Agreement. We find no authority supporting this limited

construction of what it means to "market" a product.

¶ 29 Instead, we construe the meaning of "market" in the context of its use in the Agreement. Viewing the Agreement in its entirety, we consider the purposes of the Agreement, and give effect to every part. *See State ex rel. Goddard v. R.J. Reynolds Tobacco Co.*, 206 Ariz. 117, 120, ¶ 12, 75 P.3d 1075, 1078 (App.2003).

¶ 30 Paragraph 3 of the Agreement requires UDA to "use its best efforts to market the Member's milk *in such manner* as the Association shall deem to be to the best advantage of the Member and all other Members of the Association...." (Emphasis added.) UDA's contractual duty to "market" milk reasonably includes taking actions to protect its long-term ability to sell at prices beneficial to its members. UDA attempted to obtain long-term contracts and premiums from its primary customers by limiting the supply of milk from its members and from members of other cooperatives. In doing so, it was exercising its authority to "market" in a manner it deemed to be to the best advantage of its members.

¶ 31 Even assuming UDA's strategy was questionable,[7] the "business judgment" rule precludes the Schuggs from claiming that UDA violated its promise to "market" the milk. The business judgment rule presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *Blumenthal v. Teets*, 155 Ariz. 123, 128, 745 P.2d 181, 186 (App.1987).

¶ 32 This rule applies equally to cooperatives. *See, e.g., Ripplemeyer v. Nat'l Grape Coop. Ass'n*, 807 F.Supp. 1439, 1447 (W.D.Ark.1992); *Santo Tomas Produce Ass'n v. Smith*, 68 N.M. 436, 362 P.2d 977, 979 (1961); *Sanchez v. Grain Growers Assoc. of Cal.*, 126 Cal.App.3d 665, 675, 179 Cal. Rptr. 459, 460 (1981). Absent an abuse of discretion, business judgments will be re-

---

7. We note that, eventually, all of UDA's customers entered long-term milk supply agreements with UDA that included premiums or "service charges" in excess of the federally-set minimum class prices.

spected by the courts. *See Blumenthal*, 155 Ariz. at 128, 745 P.2d at 186.

¶ 33 The Schuggs contend that even were the business judgment rule applicable, it does not shield UDA because its "dumping" policy involved illegal conduct. *See, e.g., Shoen v. Shoen*, 167 Ariz. 58, 65, 804 P.2d 787, 794 (App.1990) (finding that judicial inquiry is precluded where a decision is made in good faith and in the exercise of honest judgment, in the *legitimate and lawful* furtherance of the corporate purpose) (emphasis added); *see generally* 3A Fletcher Cyc. Corp. § 1040 (Perm. Ed.1986) (discussing the rule's inapplicability when directors act illegally or in bad faith). The Schuggs argue that UDA's "dumping" policy was part of an illegal anticompetitive scheme to limit milk supply in violation of federal and state antitrust laws. We disagree.

¶ 34 We first note that agricultural cooperatives are exempt from antitrust laws when they engage in collective discussions and make agreements with other agricultural cooperatives to carry out the cooperative's purpose. *See* Capper–Volstead Act of 1922, 7 U.S.C. §§ 291–92; Clayton Act, 15 U.S.C. § 17. The Capper–Volstead Act's purpose is to allow "farmer-producers to organize together, set association policy, [and] fix prices at which their cooperative will sell their produce ... without thereby violating the antitrust laws...." *Maryland & Virginia Milk Producers Ass'n v. United States*, 362 U.S. 458, 466, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960). This exemption, however, does not protect agreements among parties other than agricultural cooperatives. *Case–Swayne Co. v. Sunkist Growers, Inc.*, 389 U.S. 384, 395–96, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967) (holding that an agricultural organization was not a qualified cooperative under the Act when the organization included non-producer fruit processors).

¶ 35 The Schuggs argue that certain deposition testimony elicited before trial was evidence of an illegal agreement between UDA and Advance Milk Commodities ("AMC"), a milk broker that was not an agricultural cooperative organization, to limit milk supply. However, we agree with the trial court that this evidence does not demonstrate an illegal agreement.

¶ 36 At relevant times, the testifying witness, Ms. Karen Brooks, was a co-owner of AMC, and also served as General Manager of Security Milk Producers Association ("Security"), a California dairy cooperative. As a representative of Security, she was also a board member of WMMA. Ms. Brooks testified about discussions at a 1999 WMMA board meeting during which UDA had applied to join the agency. At the meeting, UDA expressed concerns about WMMA's ability to control milk coming into the Arizona market from AMC's independent producers. Ms. Brooks testified as follows:

Q. So you were addressing UDA's concern that the handlers might obtain alternative sources of milk if UDA requested a premium?

A. Yes.

Q. And did that discussion include a discussion of the milk being marketed by AMC for the Arizona independent producers?

A. AMC was not—AMC was selling that milk to Security because the agency had requested it. But they wanted to make sure that we had a handle on that milk and that it wouldn't move.

Q. Am I correct to understand that UDA was requesting your assurance that the milk being marketed by AMC from the Arizona independent producers would not be sold to the Arizona handlers?

A. December 1st, yeah. That we had control on it, yes.

Q. As of December 1st. Did you provide assurances that the milk being marketed by AMC for the independent producers wouldn't go to the Arizona handlers?

A. December 1st, yes, it would not.

¶ 37 The Schuggs contend that a trier of fact could infer from this evidence that UDA improperly entered into an agreement with AMC. We disagree. Any such inference would require a strained view of Ms. Brooks' statements. AMC was not a member of WMMA. Security, an agricultural cooperative, was a member, and Ms. Brooks served as Security's representative on the

WMMA board. She made these statements during a board meeting regarding WMMA's ability to control milk supplies. The testimony indicates that AMC sold to Security, a cooperative, which in turn could legally be a party to anti-competitive marketing agreements. We agree with the trial court that under the *Orme School* standard, this is insufficient evidence from which a reasonable person could find that UDA violated antitrust laws.[8] Thus, the trial court properly granted UDA's motion for summary judgment on this counterclaim.

### B. The Schuggs' Counterclaims for their Applications for Base Transfer

¶ 38 The Schuggs' other counterclaims for breach of the implied covenant of good faith and fair dealing, interference with contract, and unjust enrichment relate to UDA's failure to approve their application for "base transfer." The disposition of this issue requires an understanding of how UDA's base plan operates.

¶ 39 UDA members hold or may purchase an amount of "base"[9] which is measured in hundreds of pounds. UDA's plan generally assures a member that he will be paid a "quota price" for an amount of milk equal to the amount of base that he holds.[10] For any amount of milk produced in excess of the base, UDA pays a lower price.

¶ 40 UDA members may acquire base by purchasing it from other members or through UDA's base earning programs for new and existing producers. UDA approval is required before one member may obtain additional base by transfer from another member. At the time of these events, the Schuggs had acquired 65,685 pounds of base, some of which they purchased at prices ranging from $15 to $27 per pound.

¶ 41 In September and October 2001, the Schuggs completed three agreements to transfer (sell) their base to third parties and submitted base transfer applications to UDA. UDA tabled the Schuggs' applications indefinitely and did not approve them. Consequently, the Schuggs filed counterclaims against UDA. They contended that UDA's decision to table their applications violated the implied covenant of good faith and fair dealing, interfered with the contracts they executed to sell their base, and unjustly enriched UDA because it retained the unclaimed premium payments that this base would have generated. In response, UDA contended, in part, that in light of the Schuggs' breach of the Membership Agreement, they had no legal basis to expect that UDA would process the base transfer applications.

¶ 42 In granting UDA's motion for summary judgment on these claims, the trial court found that evidence of the Schuggs' expectations regarding their base transfer applications was "so weak as to be nearly non-existent." It also found that whether the Schuggs were in breach of the Agreement was at least "debatable;" accordingly, the Schuggs could not reasonably have expected a pro forma approval of their base transfer applications.

¶ 43 On this record, we find a genuine question of material fact on the Schuggs' claims for breach of the implied covenant of good faith and fair dealing, and interference with contract. The Schuggs presented adequate evidence of their reasonable expectation that their base had an economic value for which they could be compensated. The Schuggs had executed contracts with several individuals to purchase their base. They also listed their base as an asset on financial statements and used it as collateral for bank loans. The fact that UDA had a standard

---

**8.** Having found that the evidence was insufficient to raise a factual issue concerning whether UDA violated antitrust laws, we do not address UDA's contention that the Schuggs lack standing to assert this claim.

**9.** "Base" is a term applied to a UDA member's daily pounds of milk production for which he is paid by UDA. "Base" is also the mechanism UDA utilizes to value each producer's share of UDA's

total allocation for the sale of its members' milk. The more "base" a member owns, the more of that member's milk receives a higher price from UDA's proceeds of its sale of milk.

**10.** This court's decision in *Lueck v. United Dairymen of Ariz.*, 162 Ariz. 232, 782 P.2d 708 (App. 1989) more fully describes the background and operation of the plan.

application form to transfer the base indicates that the base had a recognized economic value and that UDA members could reasonably expect to obtain something in return for the transfer. The Schuggs also presented evidence that, prior to the effective denial of their applications, no other members had been denied the right to transfer their base.

¶ 44 UDA argues that the Schuggs failed to meet the non-compete conditions in the application to transfer their base. These conditions required that the Schuggs not sell to certain Arizona milk customers or lease to a dairy that was doing so for three years. Under these circumstances, UDA argues, it was unreasonable for the Schuggs to expect UDA to approve their applications. UDA also contends that it had no duty to honor the Schuggs' applications because the Schuggs were in breach of their contractual obligations to UDA and were guilty of fraud. Further, UDA argues that the Schuggs had no justifiable expectation that UDA would consider and grant their applications in light of a letter Mr. Schugg allegedly wrote to Maverick.[11]

¶ 45 While these assertions are relevant to whether the Schuggs can prevail on their claims, they reflect factual disputes, not a lack of evidence sufficient to create a genuine issue for the jury. Whether the Schuggs could comply with the non-compete provisions of the application and whether they had acted fraudulently so as to excuse performance by UDA[12] should have been submitted to the jury. The admissibility and the interpretation of the letter from Mr. Schugg to Maverick was also in dispute. Thus, we find that sufficient evidence was presented to preclude summary judgment on the Schuggs' claims for breach of the implied covenant of good faith and fair dealing, and for interference with contract.

¶ 46 The trial court also granted summary judgment in favor of UDA on the Schuggs' unjust enrichment claim. UDA argued that the rights of the parties were governed by the contract. The Schuggs claimed that it was proper to plead unjust enrichment in the alternative to their breach of contract claim.

¶ 47 In *Trustmark Ins. Co. v. Bank One, Arizona, NA,* this court held that the trial court properly granted a JMOL for the defendant when the plaintiff was pursuing an unjust enrichment claim, not in the alternative to its original claim, but rather, to avoid contractual limitations on its claim. 202 Ariz. 535, 542–43, ¶ 32, 48 P.3d 485, 492–93 (App. 2002). Here, the Schuggs based their claim for unjust enrichment on the value of the amount of unclaimed base retained by UDA rather than the amount that the Schuggs could have obtained by selling it in 2001. Depending on the quota price for base in the interim, this value is potentially greater than the amount the Schuggs could have recovered if UDA had granted their applications in 2001. The parties' rights are subject to the terms of the Agreement and we find that the doctrine of unjust enrichment has no applicability in this instance. *See Brooks v. Valley Nat'l Bank,* 113 Ariz. 169, 174, 548 P.2d 1166, 1171 (1976) (stating that the existence of a contract specifically governing rights and obligations of each party precludes recovery for unjust enrichment). Therefore, we find that the trial court properly granted summary judgment on the unjust enrichment claim.

## IV. CONCLUSION

¶ 48 We reverse the judgment in favor of UDA on its claim for breach of the implied covenant of good faith and fair dealing and direct entry of judgment for the Schuggs. We affirm summary judgment in favor of UDA on the Schuggs' claims for bad faith breach and breach of fiduciary duty regarding UDA's obligations to market their milk. We also affirm summary judgment in favor of UDA on the counterclaim for unjust en-

---

11. Mr. Schugg wrote a letter "to whom it may concern" stating that he would no longer be shipping any milk under his milk base, and that if he were unable to transfer base he would be "walking [away] from it." UDA argued that Mr. Schugg wrote this letter to demonstrate his commitment to Maverick.

12. The jury verdict that the Schuggs did not breach the Agreement is *res judicata* between these parties, and therefore breach of the Agreement cannot be utilized by UDA as an affirmative defense to these counterclaims.

richment. We reverse summary judgment on the Schuggs' claims for breach of the implied covenant of good faith and fair dealing and interference with contract regarding UDA's failure to approve their applications to transfer their base, and we remand for further proceedings on those claims.

¶ 49 Based on the foregoing, we also reverse the trial court's award of attorneys' fees. On remand, the trial court is authorized to consider the parties' respective applications for attorneys' fees in light of the reversal of the judgment for UDA and the ultimate disposition of the remaining counterclaims.

¶ 50 We grant the Schuggs' request for reasonable attorneys' fees on appeal pursuant to A.R.S. § 12–341.01 in an amount to be determined following submission of a statement of costs in accordance with Arizona Rule of Civil Appellate Procedure 21(c).

JEFFERSON L. LANKFORD and JON W. THOMPSON, JJ., concur.

