NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

LOREN WILSON and SHARON T. WILSON, husband and wife,
*Plaintiffs/Appellees*,

*v.*

PNC MORTGAGE, a division of PNC BANK, N.A.; PNC BANK, N.A.;
and PNC BANK dba PNC MORTGAGE, *Defendants/Appellants*.

No. 1 CA-CV 14-0024

FILED 2-3-2015

Appeal from the Superior Court in Maricopa County
No. CV2010-070042
The Honorable Eileen S. Willett, Judge (Retired)

**VACATED AND REMANDED WITH INSTRUCTIONS**

COUNSEL

Kelhoffer Manolio & Firestone, PLC, Scottsdale
By Veronica L. Manolio
*Counsel for Plaintiffs/Appellees*

Ballard Spahr LLP, Phoenix
By John G. Kerkorian, Craig C. Hoffman, Brunn W. Roysden, III
*Counsel for Defendants/Appellants*

---

## MEMORANDUM DECISION

Judge Patricia K. Norris delivered the decision of the Court, in which Presiding Judge Margaret H. Downie and Judge Randall M. Howe joined.

---

**N O R R I S**, Judge:

**¶1** This appeal arises out of a judgment following a jury verdict in favor of Plaintiffs/Appellees, Loren and Sharon Wilson, and against Defendants/Appellants, PNC MORTGAGE, PNC BANK, N.A., and PNC BANK dba PNC MORTGAGE (collectively, "PNC"). On appeal, PNC argues the superior court should have awarded judgment in its favor on the Wilsons' claims for breach of a proposed loan modification agreement, breach of the implied covenant of good faith and fair dealing, and tortious breach of that covenant. As we explain, we agree with PNC. Accordingly, we vacate the judgment and remand to the superior court for entry of judgment in PNC's favor and a redetermination of attorneys' fees.

### FACTS AND PROCEDURAL BACKGROUND[1]

**¶2** In May 2006, Sharon Wilson purchased a house for $525,000. Wilson made a $33,008.66 down payment and financed the remainder of the purchase price with loans from PNC's predecessor in interest, which she secured by granting it a first and second deed of trust on the property. The first loan ("Original Loan Agreement") was in the principal sum of $417,000 and bore interest at the rate of 5.875% per annum, with monthly payments of $2,502.41 (inclusive of taxes and insurance). Later in the year, Wilson paid off second loan.

**¶3** In July 2009, Wilson began seeking a loan modification. Although she initially hired a third party to assist her in negotiating a loan modification, she eventually contacted PNC herself and dealt with it directly.

---

[1]We view the "evidence in a light most favorable to upholding the jury verdict and will affirm if any substantial evidence exists permitting reasonable persons to reach such a result." *Acuna v. Kroack*, 212 Ariz. 104, 111, ¶ 24, 128 P.3d 221, 228 (App. 2006) (internal quotation marks omitted).

¶4         According to Wilson, a PNC representative told her that to obtain a loan modification she had to stop making the monthly payments under the Original Loan Agreement.  Accordingly, Wilson did not make the August and September 2009 payments.  On October 1, 2009, Wilson began a trial modification plan with significantly lower payments, which ran four months, with the last payment due January 1, 2010.  Wilson was aware she would still be responsible for the full amount of the monthly payments due under the Original Loan Agreement, but understood there would be some method to make up those payments if she did not qualify for a permanent loan modification after the trial modification.  Wilson was also aware PNC was not obligated to modify the Original Loan Agreement.  After making the four trial payments, Wilson contacted PNC and asked "what do we do now?"  PNC told Wilson to continue making the modified trial payments and that someone would contact her.

¶5         On February 24, 2010, Wilson received a $2,070.96 check and letter from PNC which explained it was returning the $2,070.96 because the "amount received [was] not sufficient to reinstate [the] loan from default."  The following day Wilson received another letter from PNC stating she had not made any monthly payments since October 1, 2009, and would need to pay $15,600.34 in certified funds by March 27, 2010 to "cure the breach or default."  The $15,600.34 equaled the sum of the two 2009 missed payments, and the difference between the modified trial payments and the payments due under the Original Loan Agreement.

¶6         At trial, Wilson testified she was "devastated" by the letters.  She had thought "things [were] going smooth[ly]" because she had been doing everything PNC asked, was in a trial modification, and believed she would obtain a permanent modification.

¶7         In February 2010, Wilson called PNC and spoke with Desmond Brown, an employee in PNC's Loss Mitigation Department, who was assigned to be the "negotiator" on her file.  Wilson testified Brown told her, "Don't worry about those letters.  We'll take care of it."  She also testified he told her, "we'll get you into a full-blown modification immediately" and she would not have to go through another trial program.  And, according to Wilson, Brown apologized for the misunderstanding.

¶8         On April 29, 2010, PNC sent Wilson a proposed "step-rate" loan modification agreement ("First Proposed Modification").  Under the terms of the First Proposed Modification, beginning in May 2010, interest on the unpaid principal balance of the Original Loan Agreement would begin to accrue at 2% (with a monthly payment of $1,472.69 inclusive of

taxes and insurance) and then would periodically "step-up" until it reached 5.25% (with a monthly payment of $2,010.45 excluding taxes and insurance) in May 2018. Although Wilson was pleased with the monthly payment, and accepted the step-rate structure of the proposal, she could not afford the proposal's initial payment of $4,417.61, which included the first month's monthly payment and a cash contribution to reduce the principal balance. Nevertheless, Wilson signed the First Proposed Modification on May 5, 2010 and returned it to PNC. On May 17, 2010 Wilson spoke to Brown and explained she could not afford the proposal's $4,417.61 initial payment. According to Wilson, at her request Brown agreed to roll the $4,417.61 into the original loan principal.

¶9　　　PNC sent Wilson a second proposed loan modification agreement, dated May 17, 2010. This proposal ("Second Proposed Modification") contained two errors. First, it did not contain the step-rate interest structure Wilson had accepted, but instead specified a fixed interest rate of 5.25% per annum. Second, although the proposal specified a fixed interest rate of 5.25% per annum, PNC had calculated the amount of the monthly payments based on an interest rate of 2% per annum. At an interest rate of 5.25% per annum—for the loan principal to amortize and be fully paid over the life of the loan—the monthly payments should have been $2,163.70, instead of the $1,370.84 specified in the proposal. Wilson signed the Second Proposed Modification on May 21, 2010 and returned it to PNC along with the initial monthly payment the proposal required.

¶10　　　According to internal records, PNC reviewed Wilson's account on June 7, 2010, and discovered the Second Proposed Modification failed to incorporate the step-rate interest structure. In an effort to address this error, PNC sent Wilson another proposed loan modification agreement, ("Third Proposed Modification") which, unfortunately, was identical to the Second Proposed Modification and contained the same errors. Wilson signed the Third Proposed Modification on June 12, 2010 and returned it to PNC. Although the sequence of events summarized in PNC's records is not entirely consistent with Wilson's trial testimony, Wilson testified she spoke to Brown about the fixed interest rate contained in the Third Proposed Modification and he explained he had received approval from his supervisor to "go with" the fixed interest rate modification documents Wilson had already signed.

¶11　　　Wilson made three payments to PNC of $1,490.41 (the $1,370.84 monthly payment specified in the Third Proposed Modification plus taxes and insurance) on May 25, August 2, and September 1, 2010. In a letter dated September 18, 2010, PNC sent a refund check to Wilson for

$4,471.23, the total amount of these three payments. The letter explained the payments were insufficient to reinstate her loan from default.

¶12        In early October 2010, Wilson saw a Notice of Trustee's Sale that had been posted on her garage door. The notice had been recorded September 23, 2010 and stated her home would be sold at public auction on December 23, 2010 pursuant to the Original Loan Agreement.

¶13        Wilson and her husband attempted to contact Brown several times but were unsuccessful. Then, Wilson received an October 6, 2010 letter from Brown. In the letter, Brown explained PNC had miscalculated the terms of the proposed loan modification agreement, and the monthly payment of principal and interest should have been $2,163.70. Brown included another proposed loan modification agreement with his letter ("Fourth Proposed Modification"); that proposal was similar in structure to the First Proposed Modification. Brown apologized for any inconvenience the "issue" had caused, and stated, "I have noticed that you are now active in foreclosure for an error on our part and we will waive all legal fees because this was due to our error and not yours."

¶14        Wilson did not sign the Fourth Proposed Modification. Instead, she and her husband sued PNC and asserted claims for breach of the Original Loan Agreement, breach of—as Wilson testified at trial—the Third Proposed Modification, and breach of the implied covenant of good faith and fair dealing ("implied covenant"). Wilson also requested the court enjoin the trustee's sale pending "proof" of a material default. During the course of the case, Wilson tendered monthly payments to PNC in the amount of $1,490.41 pursuant to the Third Proposed Modification; however, PNC returned the payments to Wilson, with the exception of three payments in August, September, and October of 2011. Although PNC did not cancel the trustee's sale, it did not go forward with it.[2]

¶15        The Wilsons' claims were tried in two phases. In phase one, the jury was asked to determine whether PNC had breached the Original Loan Agreement, the Third Proposed Modification, and the implied covenant. The jury was also asked to determine whether a "special relationship" existed between the Wilsons and PNC for purposes of the Wilsons' claim for tortious breach of the implied covenant.

---

[2]In August 2013, after the superior court entered judgment in the Wilsons' favor, PNC cancelled the trustee's sale.

**¶16**         During phase one, the court allowed the Wilsons to amend their complaint to request specific performance of the Third Proposed Modification.  Before submitting phase one to the jury, however, the Wilsons elected to pursue only a remedy at law—money damages—and not specific performance.

**¶17**         The jury returned three verdicts finding PNC, first, had not breached the Original Loan Agreement; second, had breached the Third Proposed Modification; and third, had breached the implied covenant.  The jury awarded $125,108.23 on the breach claims, *see infra* ¶ 36, and found a special relationship between the Wilsons and PNC.

**¶18**         The second phase of the trial addressed the Wilsons' claim for tortious breach of the implied covenant.  The jury awarded the Wilsons $174,000 in tort damages on that claim as well as $171,000 in punitive damages.

**¶19**         After the superior court entered judgment for the Wilsons in accordance with the jury's verdicts, PNC timely renewed its motions for judgment as a matter of law ("JMOL") and also moved for a new trial.  The superior court denied PNC's motions.

## DISCUSSION

I.     The Statute of Frauds and the Doctrine of Part Performance

**¶20**         On appeal, PNC argues the Third Proposed Modification was unenforceable under the statute of frauds and thus, as a matter of law, the Wilsons had no claim for its breach.  Accordingly, PNC argues the superior court should have granted its motion for JMOL and awarded judgment in its favor on that claim.  Reviewing this issue de novo, we agree.  *See United Dairymen of Ariz. v. Schugg*, 212 Ariz. 133, 137, ¶ 13, 128 P.3d 756, 760 (App. 2006).

**¶21**         Under Arizona's statute of frauds, "[n]o action shall be brought in any court" on an agreement "for the sale of real property or an interest therein" unless the agreement "or some memorandum thereof, is in writing and signed by the party to be charged."  Ariz. Rev. Stat. ("A.R.S.") § 44-101 (2013).[3]

---

[3]We cite to the current version of A.R.S. § 44-101 because it has not been amended since 1989.  Although the Arizona Legislature

**¶22** Although the parties agree modification of the Original Loan Agreement was subject to the statute of frauds, *see Best v. Edwards*, 217 Ariz. 497, 500, ¶ 10, 176 P.3d 695, 698 (App. 2008) (modification of material term in agreement subject to statute of frauds must also be in writing); *Snyder v. HSBC Bank, USA, N.A.*, 873 F. Supp. 2d 1139, 1150 (D. Ariz. 2012) (modification of material terms of mortgage loan or loan secured by deed of trust also subject to statute of frauds), they part company regarding the identity of the party to be charged under the Third Proposed Modification, with PNC asserting it was the party to be charged, and the Wilsons asserting they were the party to be charged. Although the superior court agreed with the Wilsons, under controlling Arizona case law, PNC was the party to be charged.

**¶23** For purposes of the statute of frauds, the party to be charged is "the party against whom the contract is sought to be enforced." *Passey v. Great W. Assocs. II*, 174 Ariz. 420, 425, 850 P.2d 133, 138 (App. 1993). Here, the Wilsons sued PNC for breach of the Third Proposed Modification. Although Wilson was the debtor, and thus the party to be charged under the Original Loan Agreement, she was seeking to enforce the Third Proposed Modification against PNC, and under that proposal, PNC was the party to be charged. *See id.* (although trustor was party to be charged under deed of trust, trustor was not party to be charged when it sought to enforce acreage release provision in deed of trust addendum that was not signed by beneficiary). Accordingly, because PNC did not sign the Third Proposed Modification, the statute of frauds applied to the Wilsons' claim for breach of the Third Proposed Modification.

**¶24** An agreement that otherwise falls within the statute of frauds can, nevertheless, be excluded from the statute through the doctrine of part performance. *See Owens v. M.E. Schepp Ltd. P'ship*, 218 Ariz. 222, 226, ¶¶ 15-16, 182 P.3d 664, 668 (2008) (acts of part performance may take alleged contract outside statue of frauds if undertaken in reliance on it and cannot be explained in its absence). The doctrine of part performance is "grounded in the equitable principle of estoppel." *Id.* at 226, ¶ 15, 182 P.3d at 668. It is, thus, only available when a party is seeking an equitable remedy for enforcement of an oral agreement; it is not available to a party seeking only

---

amended the other statute cited in this decision (A.R.S. § 12-341.01) after PNC proposed the Fourth Proposed Modification, the revision is immaterial to the resolution of this case and thus we cite to its current version.

a legal remedy such as money damages. *Rudinsky v. Harris*, 231 Ariz. 95, 101, ¶ 25, 290 P.3d 1218, 1224 (App. 2012).

**¶25** Here, PNC argues that because the Wilsons decided at the close of the evidence in phase one to pursue only a legal remedy—money damages—and not specific performance, the Wilsons lost any right they might have had to rely on the doctrine of part performance. We agree. As our supreme court recognized in *Evans v. Mason*, 82 Ariz. 40, 44, 308 P.2d 245, 248 (1957), despite the abolition of the distinction between law and equity, the part performance doctrine is grounded in equity and cannot be used to "sustain an action at law on a contract within in [sic] the Statute of Frauds."

**¶26** The Wilsons' claim for breach of the Third Proposed Modification was barred by the statute of frauds, and the Wilsons lost any right they had to rely on the doctrine of part performance. The superior court, therefore, should have entered judgment for PNC on this claim.

II.     Breach of the Implied Covenant

**¶27** PNC next argues that because the Third Proposed Modification was unenforceable under the statute of frauds, it could not serve as the basis for the Wilsons' claim of breach of the implied covenant. Thus, it argues the superior court should have granted PNC's motion for JMOL and entered judgment in its favor on this claim. We agree that because the Third Proposed Modification was unenforceable under the statute of frauds it could not support the jury's verdict in the Wilsons' favor on their claim for breach of the implied covenant. *See Norman v. State Farm Mut. Auto. Ins. Co.*, 201 Ariz. 196, 198, ¶ 1, 33 P.3d 530, 532 (App. 2001) (contract must exist before there can be a breach of implied covenant).

**¶28** This does not mean, however, that the superior court should have entered judgment in PNC's favor on this claim. This is because, as the Wilsons argue, the jury's finding that PNC breached the implied covenant could have been based on the implied covenant arising from the Original Loan Agreement. *See United Dairymen*, 212 Ariz. at 137, ¶ 15, 128 P.3d at 760 ("A party can breach the implied covenant of good faith and fair dealing without breaching an express provision of the underlying contract."). Indeed, in the phase one closing argument the Wilsons' attorney argued that in pursuing foreclosure, PNC had violated the implied covenant under the Original Loan Agreement.

**¶29** "The law implies a covenant of good faith and fair dealing in every contract." *Rawlings v. Apodaca,* 151 Ariz. 149, 153, 726 P.2d 565, 569

(1986). The implied covenant requires both parties to "refrain from acting in a manner that would impair the right of the other to receive the benefits of their agreement." *FL Receivables Trust 2002-A v. Ariz. Mills, L.L.C.*, 230 Ariz. 160, 169, ¶ 41, 281 P.3d 1028, 1037 (App. 2012). "A party breaches the covenant by denying the other party the 'reasonably expected benefits' of the contract." *Id.* "Whether a party breached the implied covenant is a question of fact." *Id.* As a reviewing court, we will not set aside the jury's verdict if it is supported by substantial evidence permitting reasonable persons to reach such a result. *Acuna v. Kroack*, 212 Ariz. 104, 111, ¶ 24, 128 P.3d 221, 228 (App. 2006).

¶30 The Wilsons presented evidence, and the jury could have found, that PNC breached the implied covenant under the Original Loan Agreement by invoking and pursuing its right to foreclose the property without providing Wilson a notice of default and an opportunity to cure as required by the deed of trust.[4]

¶31 Wilson testified she had been instructed by PNC to miss payments before she entered the trial program, and at the end of the trial program had been told to continue making the modified payments, which she did. Although Wilson received letters in February, 2010 informing her she was in default, Brown told her not to worry about the letters, telling her that he would "take care of it," and would work towards getting her into a "full-blown modification." Thereafter, Wilson signed and returned the three loan modification proposals PNC sent to her, and began making monthly payments in the amount specified in the Third Proposed Modification. PNC began foreclosure proceedings, recording the Notice of Trustee's Sale on September 23, 2010, without providing Wilson—despite the foregoing—with a notice of default and an opportunity to cure. And, it pursued foreclosure even though Brown acknowledged in his October 6, 2010 letter to the Wilsons that they were "in" foreclosure because of PNC's error. Reviewing this evidence in the light most favorable to sustaining the jury's verdict, the jury's verdict was supported by substantial evidence. *See Acuna*, 212 Ariz. at 111, ¶ 24, 128 P.3d at 228.

¶32 Despite this evidence, PNC nevertheless argues the Wilsons "cannot prove" it breached the implied covenant under the Original Loan

---

[4]After a default, the deed of trust securing the Original Loan Agreement required the "lender" to notify the "borrower" of the default and give the "borrower" not less than 30 days from the date of the notice to cure the default before accelerating and invoking the power of sale.

Agreement because that agreement did not require it to negotiate or offer a loan modification. This argument is not properly before us.

¶33 PNC did not challenge the sufficiency of the evidence to support the Wilsons' claim for breach of the implied covenant of the *Original Loan Agreement* in its motions for JMOL or motion for new trial. Rather, in those motions PNC only challenged the implied covenant claim under the *Third Proposed Modification*—mainly by attacking the enforceability of the proposal under the statute of frauds, as it has done here.[5]

¶34 Further, although PNC argued in a motion for summary judgment that it could not be liable for breach of the implied covenant under the Original Loan Agreement, the superior court denied the motion, and "[g]enerally the denial of a summary judgment motion is not reviewable on appeal from a final judgment entered after a trial on the merits." *John C. Lincoln Hosp. & Health Corp. v. Maricopa Cnty.*, 208 Ariz. 532, 539, ¶ 19, 96 P.3d 530, 537 (App. 2004). Although an exception to this rule exists if the denial is based on a purely legal issue, *id.*, that exception is inapplicable here. An issue is purely legal if it "is one that does not require the determination of any predicate facts, namely, 'the facts are not merely undisputed but immaterial.'" *Id.* at 539 n.5, ¶ 19, 96 P.3d at 537 n.5. The superior court denied PNC's summary judgment motion, finding "genuine issues of material fact" as to each of the Wilsons' claims, and as discussed above, whether there was a breach of the implied covenant under the Original Loan Agreement turned on the facts. *See supra* ¶¶ 29-31. Under these circumstances, to preserve this issue for appeal, PNC was required to reassert this argument in a Rule 50 motion for judgment as a matter of law or other post-trial motion. *John C. Lincoln Hosp.*, 208 Ariz. at 539, ¶ 19, 96 P.3d at 537; Ariz. R. Civ. P. 50.

¶35 Thus, we agree with the Wilsons that the jury's finding that PNC breached the implied covenant could have been based on the implied covenant under the Original Loan Agreement.

---

[5]At oral argument in this court, PNC asserted that at trial it had moved for JMOL on the Wilsons' claim for breach of the implied covenant under the Original Loan Agreement. The record reflects, however, that PNC's motion—which the court denied—addressed the Wilsons' claim for breach of the Original Loan Agreement.

III.    Damages

¶36         At trial, the Wilsons argued they were entitled to recover the total amount of money they had invested in the property because PNC was "stealing [their] home for breaking a contract [they] didn't break."  The Wilsons requested $219,536.18 in total damages: $33,008.66 attributable to their down payment on the property; $82,337.00 as payoff of the second loan; $94,427.95 in payments under the Original Loan Agreement; $5,291.34 in payments under the trial modification; and $4,471.23 for the August, September, and October 2011 payments under the Third Proposed Modification.  *See supra* ¶ 14.  The Wilsons further argued they had proven their damages with certainty because the trustee's sale was a "foregone conclusion."  The jury agreed in part with the Wilsons' damage theory and awarded them $125,108.23, which was equal to the Wilsons' claimed damages less the $94,427.95 in Original Loan Agreement payments.

¶37         On appeal, PNC argues that even if it breached a valid contract, the superior court should have granted its motion for JMOL or at a minimum its motion for new trial on the Wilsons' breach claims because they failed to present evidence they had actually been damaged by any breach or had sustained non-speculative damages.  PNC argues the Wilsons' damages were utterly dependent on the occurrence of the trustee's sale which had not happened.  Reviewing this issue de novo, s*ee supra* ¶ 20, we agree with PNC.  *See Coury Bros. Ranches, Inc. v. Ellsworth*, 103 Ariz. 515, 521, 446 P.2d 458, 464 (1968) ("Proof of the fact of damages must be of a higher order than proof of the amount of damages."); *see also Gilmore v. Cohen*, 95 Ariz. 34, 36, 386 P.2d 81, 82 (1963) ("conjecture or speculation cannot provide the basis for an award of damages").

¶38         As discussed, the jury found PNC had breached the implied covenant.  Ordinary contract damages are the proper measure of damages for a contract claim of breach of the implied covenant.  *See United Dairymen*, 212 Ariz. at 139, ¶ 21, 128 P.3d at 762; *see also Enyart v. Transamerica Ins. Co.*, 195 Ariz. 71, 76, ¶ 14, 985 P.2d 556, 561 (App. 1998).  "Damages recoverable in a contract action are those proximately caused by the breach."  *N. Ariz. Gas Serv., Inc. v. Petrolane Transp., Inc.*, 145 Ariz. 467, 478, 702 P.2d 696, 707 (App. 1984).

¶39         Here, the jury awarded damages based on a foreclosure that had not happened.  Wilson admitted at trial the damages she was seeking were dependent upon the foreclosure of the property.  She also testified she did not know when the foreclosure would occur, and agreed that if PNC did not foreclose she would not be entitled to money damages.

Accordingly, because the trustee's sale had not occurred, the Wilsons had not sustained any actual loss.

**¶40**	Further, the Wilsons did not present any evidence that because PNC had breached the implied covenant they had incurred late fees or other costs that could have resulted from that breach. *Cf. Steinberger v. McVey ex rel. Cnty. of Maricopa*, 234 Ariz. 125, 138, ¶ 50, 318 P.3d 419, 432 (App. 2014) (complaint asserting claim for "negligent performance of an undertaking" was legally sufficient to show economic harm when it listed "late fees, principal and interest accrual, damage to credit, retention of loan modification companies, and other harm"). Thus, because the Wilsons failed to show they had been damaged by PNC's breach of the implied covenant, the superior court should have granted PNC's motion for JMOL and entered judgment in its favor on the breach of implied covenant claim. *See United Dairymen*, 212 Ariz. at 139, ¶ 21, 128 P.3d at 762 (judgment reversed when party failed to present evidence to support award of contract damages; appellate court will not remand on claim when party chose not to present evidence that could support proper recovery for claim).

## IV.	Special Relationship / Tort Damages

**¶41**	Next, PNC argues the superior court should have granted its motion for JMOL and awarded judgment in its favor on the Wilsons' claim for tortious breach of the implied covenant because, as a matter of law, they failed to prove they had a special relationship with PNC. Reviewing the superior court's ruling on PNC's motion for JMOL on this claim de novo, *see supra* ¶ 20, we agree.

### A.	Fiduciary Relationship

**¶42**	A breach of the implied covenant may provide the basis for imposing tort damages when there is "a special relationship between the parties arising from elements of public interest, adhesion, and fiduciary responsibility." *Burkons v. Ticor Title Ins. Co. of Cal.*, 168 Ariz. 345, 355, 813 P.2d 710, 720 (1991) (citing *Rawlings*, 151 Ariz. at 158-59, 726 P.2d at 574-75). It is well settled "that the relationship between a Bank and an ordinary depositor, absent any special agreement, is that of debtor and creditor." *McAlister v. Citibank (Ariz.), a Subsidiary of Citicorp*, 171 Ariz. 207, 212, 829 P.2d 1253, 1258 (App. 1992) (internal quotation marks omitted).

> Only once has an Arizona court held that a fiduciary relationship existed between a bank and its customer. In *Stewart,* the supreme court concluded that a fiduciary duty was owed by a

> bank to its customer because (1) the bank acted as the customer's financial advisor for many (twenty-three) years, and (2) the customer relied upon the bank's financial advice.

*Id.* (citations omitted).

¶43        Here, PNC did not act as the Wilsons' financial advisor, nor did the Wilsons rely on PNC for financial advice. Indeed, the Wilsons initially hired a third party to negotiate with PNC, they were PNC's customers for less than five years, and even though the Wilsons believed Brown had helped them, they were always aware he was PNC's employee and that his duty was to it. Although Wilson called Brown her "hero" at trial, she presented no evidence of a special relationship other than the fact Brown had attempted to work out a loan modification for his employer that would also be acceptable to Wilson, and at times apologized to the Wilsons for errors and inconveniences; this does not give rise to a special relationship. Thus, without more, as a matter of law no fiduciary duty existed between PNC and the Wilsons. *McAlister*, 171 Ariz. at 212, 829 P.2d at 1258.

### B.        Unfair Bargaining Power

¶44        Wilson argued at trial that because PNC had the "trustee's sale hanging over [the Wilsons'] head," they did not have equal bargaining power, and that created a special relationship between them. As a matter of law, "'a mere difference in bargaining power without more does not establish' a special relationship between parties." *McAlister*, 171 Ariz. at 213, 829 P.2d at 1259 (quoting *Oldenburger v. Del E. Webb Dev. Co.*, 159 Ariz. 129, 133, 765 P.2d 531, 535 (App. 1988)). Although PNC made a series of errors in making the loan modification proposals, the Original Loan Agreement did not obligate it to propose or even make a loan modification; and the Wilsons were not obligated to accept any of PNC's proposed loan modifications. Indeed, the record shows PNC attempted to provide Wilson with a loan modification on terms she could accept.

¶45        Thus, because the Wilsons failed to show as a matter of law any special relationship with PNC, the superior court should have granted PNC's motion for JMOL on the Wilsons' claim for tortious breach of the implied covenant and entered judgment in PNC's favor on this claim. And for this reason, the superior court should have also granted PNC's motion for JMOL on the Wilsons' claim for punitive damages. *See Wyatt v.*

*Wehmueller*, 167 Ariz. 281, 285, 806 P.2d 870, 874 (1991) ("plaintiff must be entitled to actual damages before being entitled to punitive damages").

## CONCLUSION

**¶46** For the foregoing reasons, the superior court should have granted judgment in PNC's favor on the Wilsons' claims for breach of the Third Proposed Modification, breach of the implied covenant, and tortious breach of the implied covenant. Given this, the Wilsons were not the successful party in the superior court and were not entitled to an award of attorneys' fees under A.R.S. § 12-341.01 (Supp. 2014). We therefore vacate the judgment in favor of the Wilsons and remand to the superior court for it to enter a judgment in favor of PNC on the Wilsons' claims. On remand, the superior court may determine whether PNC is entitled to an award of attorneys' fees.

**¶47** Finally, pursuant to A.R.S. § 12-341.01, PNC has requested an award of attorneys' fees on appeal. In the exercise of our discretion we deny its request for fees on appeal. As the prevailing party on appeal, however, we award PNC its costs on appeal contingent on its compliance with Arizona Rule of Civil Appellate Procedure 21.



**Ruth A. Willingham** · **Clerk of the Court**
F I L E D : ama