NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

BECKER BOARDS SUMMIT, LLC, *Plaintiff/Appellant,*

*v.*

THE SUMMIT AT COPPER SQUARE CONDOMINIUM ASSOCIATION,
*Defendant/Appellee.*

No. 1 CA-CV 18-0091
FILED 12-20-2018

Appeal from the Superior Court in Maricopa County
No. CV2015-006450
The Honorable Hugh E. Hegyi, Judge

**AFFIRMED**

COUNSEL

Kercsmar & Feltus, PLLC, Scottsdale
By Todd Feltus, Molly Rogers
*Counsel for Plaintiff/Appellant*

Carpenter, Hazlewood, Delgado & Bolen, LLP, Tempe
By Curtis S. Ekmark, Charles E. Markle
*Counsel for Defendant/Appellee*

---

## MEMORANDUM DECISION

Judge James B. Morse Jr. delivered the decision of the Court, in which Presiding Judge James P. Beene and Judge Michael J. Brown joined.

---

**M O R S E**, Judge:

¶1        Appellant Becker Boards Summit, LLC ("BB Summit") appeals from the superior court's final judgment granting Appellee Summit at Copper Square Condominium Association's ("Association") Motion for Summary Judgment and ordering BB Summit to remove all signage from the exterior walls of the Summit at Copper Square Condominium ("Condominium").  For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2        The Condominium was created pursuant to the Arizona Condominium Act ("Act") through the recording of the Condominium Declaration for the Summit at Copper Square, a Condominium ("Declaration").  The Association is a residential condominium association, where all the Unit[1] owners of the Condominium are members of the Association.  The Condominium is divided into two types of property: (1) 165 Units owned by individual members; and (2) Common Elements[2] jointly owned by all members.  There is a "Period of Declarant Control," as described under Section 1.38 of the Declaration, which means the Declarant controls the Association on the date the Declaration is recorded until either: "(a) ninety (90) days after the conveyance of  seventy-five percent (75%) of

---

[1]        Under Section 1.47 of the Declaration, a "Unit" is a portion of the Condominium and is limited to the Unit Boundaries set forth in the Declaration.  Section 2.5 of the Declaration states that "Unit Boundaries" include: (1) vertical boundaries, which are the "interior unfinished surfaces of the perimeter walls" of each Unit; (2) lower horizontal boundaries, which are the "unfinished surface floor[s]" of each Unit; and (3) upper horizontal boundaries, which is the "underside surface of the concrete slab" above each Unit.

[2]        Under Section 1.12 of the Declaration, "Common Elements" means all portions of the Condominium other than the Units.  *See also* A.R.S. § 33-1202(7).

the Units which may be created to Owners other than the Declarant; or (b) four (4) years after all Declarants have ceased to offer Units for sale in the ordinary course of business."

¶3        Each Unit is allocated an undivided interest in the Common Elements, which includes, but is not limited to, the exterior of the building, walls, elevators, and roof.  Some Common Elements, referred to as Limited Common Elements ("LCE"), are allocated for the exclusive use of one or more, but fewer than all, of the Units.  LCEs include fixtures located outside the boundaries of a Unit, and all doors and windows in the perimeter walls of a Unit.

¶4        The Summit at Copper Square, LLC, was the original "Declarant" and it executed the Declaration through its member, W Developments, LLC ("W LLC").  Under Section 1.18 of the Declaration, a "Declarant" is described in the Declaration as the Summit at Copper Square, LLC and its "successors and any [p]erson to whom it may transfer any Special Declarant Right"[3] by a recorded instrument.

¶5        W LLC ran into financial difficulties, however, and in 2010, Stearns Bank, W LLC's lender, foreclosed on W LLC's interest and acquired W LLC's right, title, and interest in the Condominium at a trustee's sale.  In 2011, Urban Commons, LLC ("Urban Commons"), a real estate management company, made a fee simple purchase of Stearns Banks' rights and interest in the Condominium.  Urban Commons, and Taylor Woods, the 50% owner of Urban Commons, recorded an Assignment and Assumption of Declarant's Rights ("Assignment").  Pursuant to the Assignment, Taylor Woods became the "Declarant" authorized to act on behalf of Urban Commons.  Additionally, as part of the purchase, Urban Commons acquired 74 units; 91 other units were sold prior to the foreclosure.  Thus, because fewer than 75% of the units had been sold, Urban Commons, as the Declarant, was in control of the Association, *see supra* ¶ 2.

¶6        In May 2012 and June 2013, Urban Commons recorded two Amendments to the Declaration (the "First Amendment" and "Second Amendment," respectively), which purported to take portions of the

---

3        Under Section 1.45 of the Declaration, a "Special Declarant Right" means, in part, a right or a combination of rights to make improvements provided for in the Declaration, exercise Development Rights, maintain the sales and management offices, and use easements for the purpose of making improvements within the Condominium.

exterior walls of the building, label them as LCEs, and "allocate[]" them to a unit it owned for its exclusive use.  The First Amendment, in part, states:

> 1.       The portion of the Common Elements labeled as "L.C.E." on Sheets 4 through 6 of the 2nd Amended Plat shall be Limited Common Elements and are allocated as Limited Common Elements to Unit 1708.

This Amendment would allow Urban Commons to exclusively use the exterior garage-level walls of the Condominium's building.  The Second Amendment expanded that grant and, in part, states:

> 1.       The portion of the Common Elements labeled as "L.C.E." [on an attached exhibit to the Second Amendment] shall be Limited Common Elements and are allocated as Limited Common Elements to Unit 1708.

The vertical and horizontal boundaries described in the Second Amendment are the exterior walls of the Condominium's building facing the street.

¶7            In June 2012, Urban Commons—through its affiliate, USC, LLC—entered into an Outdoor Advertising License Agreement ("License Agreement") with Mark Becker[4], Managing Member of Becker Boards Small, LLC ("BB Small"), to operate and maintain advertising signage within the LCE ("Signage Rights").  The License Agreement gave BB Small the "exclusive right to install, operate and maintain one or more wall signs, digital signs, or other outdoor advertising structures" on the exterior walls of the Condominium, based on the purported amendments that assigned the newly-created LCE in favor of Unit 1708.  Urban Commons, through USC, LLC, collected 55% of the gross billboard revenues under the License Agreement.  The income collected was not shared with the Association.

¶8            In May 2013, Urban Commons entered into an Agreement of Grant of Easement and Joint Escrow Instructions ("Escrow Agreement"), with Mark Becker, where Urban Commons agreed to convey an exclusive perpetual easement for "all of [Urban Commons'] right, title, and interest . . . to all the exterior walls of the garage level portions" of the Condominium.

---

[4]        Mark Becker is also the Manager of BB Summit.

¶9 On June 28, 2013, the Association granted an exclusive easement ("First Easement and Agreement") to Urban Commons for, among other things, the use and operation of the LCEs. It states:

> 1. <u>Sign Easement</u>. [Association] hereby grants to [Urban Commons] and its grantees, successors and assigns a perpetual, exclusive easement . . . for the construction, maintenance, repair, dismantling, replacement, alteration, improvement, operation . . . , illumination and use of outdoor advertising sign structures, appurtenances and related property equipment within the LCEs, including but not limited to, . . . the right to affix lighting and structures to the faces of the Building to light the 'Billboards' . . . and to accept and/or 'build out' the wall signs protruding out along the non-corners of the Building . . . and/or protruding out and/or around the corners of the Building.

Taylor Woods, as both the Manager and the President of Urban Commons and the Association, respectively, signed the First Easement and Agreement.

¶10 On the same day, June 28, 2013, BB Summit paid $875,000 to Urban Commons for an exclusive signage easement ("Second Easement and Agreement"), that granted BB Summit all of Urban Commons' Signage Rights and conveyed all of the right, title and interest relative to the License Agreement. In part, the Second Easement and Agreement states:

> B. [Urban Commons] wishes to convey, and [BB Summit] wishes to acquire, all of [Urban Commons'] rights to use the LCEs and the Appurtenant Easements over, under, upon and across the Real Estate, which conveyance shall run with the land, and [BB Summit] requires, and [Urban Commons] is willing to impose, certain restrictions on the use of the Real Estate in order to protect the value of said easements.

Two of Urban Commons' employees constituted the Association's board of directors at the time of the First Amendment and First and Second Easement and Agreement (collectively, "Easements").

¶11 In 2014, after the Amendments and Easements were granted, the Association transitioned from Declarant controlled to Unit-owner controlled, after 75% of the units in the Condominium were sold. *See supra* ¶ 2. When the Unit owners took control of the Association, they sent a demand letter to BB Summit and informed them of their intent to terminate

both Easements. BB Summit filed an action for declaratory relief and requested a preliminary and permanent injunction, restraining the Association from removing any signage from the building or engaging in "other self-help in terminating" the Easements. The Association answered and counterclaimed for declaratory and injunctive relief.

¶12 In March 2016, the Association filed a Motion for Summary Judgment, asserting 42 reasons why the Easements and Amendments are void, voidable, or otherwise invalid pursuant to the Condominium Act, the Non-Profit Corporation Act, the Restatement, Common Law, and the Declaration. BB Summit filed a response and a cross-motion for summary judgment.

¶13 In October 2016, the superior court agreed with the Association's argument that the Easements were voidable and granted the Association's Motion for Summary Judgment. Following this ruling, the Association filed a form of judgment and motion for attorneys' fees. BB Summit then filed a motion for new trial, asserting that the Declaration and statutory law enabled Urban Commons to allocate the LCEs to a unit and grant an easement right to BB Summit. The superior court denied the motion for new trial.

¶14 In March 2018, the superior court entered final judgment and declared BB Summit had no right to use the exterior walls and entered a mandatory injunction ordering BB Summit to remove the signage and restore the exterior walls to the original condition. BB Summit appealed. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1) and -2101(A)(1).

**DISCUSSION**

¶15 We review a grant of summary judgment de novo and view the facts in the light most favorable to the party against whom summary judgment has been entered. *United Dairymen of Ariz. v. Schugg*, 212 Ariz. 133, 140, ¶ 26 (App. 2006). We consider issues of statutory interpretation and the interpretation of restrictive covenants and other contracts de novo. *Ariz. Bank & Tr. v. James R. Barrons Tr.*, 237 Ariz. 401, 403-04, ¶ 7 (App. 2015); *Dunn v. FastMed Urgent Care PC*, 245 Ariz. 35, 38, ¶ 10 (App. 2018).

¶16 Summary judgment is appropriate when "the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a). "If the evidence would allow a jury to resolve a material issue in favor of either party, summary judgment is improper." *Comerica Bank v.*

*Mahmoodi*, 224 Ariz. 289, 291, ¶ 12 (App. 2010). Yet, "the mere absence of a genuine dispute of material fact does not automatically entitle a plaintiff to judgment—the plaintiff must also demonstrate that the evidence entitles it to judgment as a matter of law." *Wells Fargo Bank, N.A. v. Allen*, 231 Ariz. 209, 213, ¶ 16 (App. 2012).

## I. LCE Creation and Conveyance

**¶17** Section 1.20 of the Declaration provides that "Development Rights" mean any right granted to a Declarant to create "easements, Units, Common Elements, or Limited Common Elements within the Condominium." *See also* A.R.S. § 33-1202(14)(b) ("'Development rights' means any right or combination of rights reserved by or granted to a declarant in the declaration to . . . [c]reate easements, units, common elements or limited common elements within a condominium."). To exercise a Development Right, a Declarant "shall prepare, execute and record an amendment to the declaration which shall include a new plat." A.R.S. § 33-1220(A). Section 33-1217(A), however, provides that "allocations [of common element interests] shall not discriminate in favor of units owned by the declarant."

**¶18** Pursuant to the Declaration and the Act, BB Summit argues that, as the Declarant, Urban Commons reserved Development Rights and exercised its right to allocate an LCE by amending the Declaration and including a new plat describing the "LCE (Signage)" on the exterior walls of the Condominium building. BB Summit further argues that LCEs are distinct from Common Elements and therefore, the statutory prohibition on discriminating in favor of a Declarant's Unit does not apply to LCEs. BB Summit asserts that, the allocation of LCEs, by definition, is discriminatory to unit holders and there is no "anti-discrimination provision" in the statutory definition of LCEs. *See* A.R.S. § 33-1218. Moreover, BB Summit contends that if there was an anti-discrimination provision in A.R.S. § 33-1218, then a Declarant could never allocate an LCE to a unit it owns.

**¶19** Urban Commons, however, cannot avoid the non-discrimination provisions of the statute by ascribing a different name to Common Elements. Section 2.5 of the Declaration states that all other portions of the Unit not included in the Unit Boundaries are Common Elements. *See supra* note 1. Moreover, A.R.S. § 33-1212(1) states,

> If walls, floors or ceilings are designated as boundaries of a
> unit, all lath, furring, wallboard, . . . and any other materials
> constituting any part of the finished surfaces are a part of the

> unit, and all other portions of the walls, floors or ceilings are
> a part of the common elements.

Urban Commons renamed a Common Element—the exterior walls of the Condominium building—as a LCE by amending the Declaration. As BB Summit acknowledges, LCEs are a "subset of common elements . . . ." Hence, the assignment of the LCE, by definition, included the assignment of Common Elements and, therefore, must comply with A.R.S. § 33-1217(A).

**¶20** Here, Urban Commons converted a Common Element to its own exclusive use and allocated Signage Rights to its Unit through the License Agreement. *Supra* ¶ 7. Through the License Agreement with BB Summit, Urban Commons collected 55% of the gross billboard revenues, none of which was shared with the Association. Because the Act prohibits a Declarant from allocating a LCE in favor of its own units, we find that the Amendments are void. *See Hawk v. PC Village Ass'n, Inc.*, 233 Ariz. 94, 98, ¶ 12 (App. 2013) (citing *Garden Lakes Comty. Ass'n, Inc. v. Madigan*, 204 Ariz. 238, 244, ¶ 31 (App. 2003)) (holding that a statute superseded provisions in a homeowner's association's CC&Rs when the statute directly prohibited a condition contained in the CC&Rs); *cf. also Cypress on Sunland Homeowners Ass'n v. Orlandini*, 227 Ariz. 288, 299 n.6, ¶ 39 (App. 2011) (noting that "if there is conflict between a statute and the CC&Rs, the statute controls").

**¶21** Furthermore, notwithstanding A.R.S. § 33-1217(A) and except as permitted by statute, Common Elements

> are not subject to partition, and *any purported conveyance*, encumbrance, judicial sale or other voluntary or involuntary transfer of an undivided interest in the common elements made without the unit to which that interest is allocated is void.

A.R.S. § 33-1217(E) (emphasis added). Likewise, Section 2.6 of the Declaration also prohibits partitioning Common Elements if "any purported conveyance . . . judicial sale or other voluntary or involuntary transfer" of the Common Elements is made without the Unit to which the interest is allocated.

**¶22** BB Summit argues that the Association did not convey or encumber the Common Elements. Rather, BB Summit asserts that Urban Commons had exclusive use of the LCE and therefore could grant an easement to use the LCE. This argument also fails. As discussed above, LCEs are a subset of Common Elements and, therefore, subject to A.R.S.

§ 33-1217(E). Here, through the Easements and Amendments alike, Urban Commons attempted to "convey," *see supra* ¶ 10, a portion of the Common Elements—the portion amended and "labeled" a LCE in the Amendments—to BB Summit without Unit 1708. This conveyance permanently severs a portion of the Common Elements from the unit, and is void under A.R.S. § 33-1217(E).

## II.    Contract Termination

¶23        Section 33-1245(A) grants condominium associations the right to terminate certain contracts that were entered into before unit owners could assume control of the association's board of directors. Such contracts "shall contain a provision" that the contract may be terminated without penalty by the association. A.R.S. § 33-1245(A). These contracts include:

> 1. Any management contract or employment contract.
>
> 2. Any other contract or lease between the association and a declarant or an affiliate of a declarant.
>
> 3. Any contract or lease that is not bona fide or was unconscionable to the unit owners at the time entered into under the circumstances then prevailing.
>
> . . . .
>
> D. If a contract covered by this section fails to contain the provisions required by subsection A of this section, the contract is voidable at the option of the association.

A.R.S. § 33-1245(A), (D).

¶24        The First Easement and Agreement assigns property rights associated with the Units between the Association and Urban Commons. Although it takes a different form—as an easement—it falls within the meaning of "other contract . . . between the association and a declarant or an affiliate of a declarant." A.R.S. § 33-1245(A)(2). Thus, because the First Easement and Agreement was entered into before the Unit owners could assume control of the Association, the Association had the authority to void it; they did so properly by giving notice to Urban Commons of their intent

to terminate it.[5]  Because the Association had the authority to void the First Easement and Agreement, the superior court did not err in granting summary judgment.

¶25          Furthermore, because the First Easement and Agreement has been voided, it no longer has any legal effect.  *See Nat'l Union Indem. Co. v. Bruce Bros.*, 44 Ariz. 454, 463-64 (1934) (holding that the plaintiff may no longer maintain his action because the contract in issue is voided, and thus "cannot in any manner have life breathed into it").  Accordingly, the Signage Rights granted to Urban Commons in the First Easement and Agreement revert back to the Association and the superior court did not err in granting summary judgment to the Association.

¶26          Because we affirm the superior court's findings and order granting the Association's Motion for Summary Judgment, it is not necessary to address BB Summit's other arguments on appeal.

## III.    Attorneys' Fees and Costs

¶27          Both parties request an award of attorneys' fees and costs incurred on appeal pursuant to A.R.S. §§ 12-341 and -341.01.  BB Summit is not the successful party on appeal and its request is denied.  As the successful party in a matter arising under contract, we award the Association reasonable attorneys' fees and costs incurred on appeal upon compliance with Arizona Rule of Civil Appellate Procedure 21.

---

[5]          BB Summit acknowledges that the First Easement and Agreement "meets the test" for a contract under A.R.S. § 33-1245(A)(2), but argues that allowing the Association to exercise its statutory termination authority "would be elevating form over substance" because the easement could have been granted unilaterally as part of the development rights.  Without deciding whether BB Summit is correct about development rights, BB Summit and Urban Commons chose the form of the transaction, and we decline to ignore the plain language of the statute.  *See SolarCity Corp. v. Ariz. Dep't. of Revenue*, 243 Ariz. 477, 480, ¶ 8 (2018) (noting that when a statute "is unambiguous, we apply it without resorting to secondary statutory interpretation principles").

## CONCLUSION

¶28      For the foregoing reasons, we affirm the superior court's final judgment.



AMY M. WOOD • Clerk of the Court
FILED: AA